## THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Desmond J. Sams, Petitioner.

Appellate Case No. 2011-195886

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Colleton County
The Honorable Perry M. Buckner, Circuit Court Judge

---

Opinion No. 27447
Heard October 2, 2013 – Filed September 24, 2014

---

## AFFIRMED

---

Tristan M. Shaffer, of Myrtle Beach, and Appellate
Defender Susan Barber Hackett, of Columbia, for
Petitioner.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Mark Reynolds Farthing, both of
Columbia, for Respondent.

---

**JUSTICE BEATTY:**  Desmond J. Sams was convicted of voluntary manslaughter after he strangled the victim, Jake Frazier, during an altercation. Sams appealed, arguing the circuit court erred in denying his request to instruct the jury on involuntary manslaughter.  The Court of Appeals affirmed.  *State v. Sams*, Op. No. 2011-UP-205 (S.C. Ct. App. filed May 4, 2011).  This Court granted Sams's petition for a writ of certiorari.  We affirm.

## I.  FACTS

In the early morning hours of April 12, 2008, Sams and Lisa Strickland, along with Frazier and Stephanie Ballard, were all drinking at Strickland's residence in Walterboro when a dispute suddenly occurred between Sams and Frazier.[1]  During the ensuing struggle, Sams managed to get on top of Frazier, who was lying face down on the floor.  Sams locked his arm around Frazier's neck while lying on top of him.  According to Ballard and Strickland, Frazier repeatedly stated that he could not breathe and he asked Sams to let him go.  Frazier also told Sams that he had children.  Sams, however, refused to release Frazier, so Ballard and Strickland tried unsuccessfully to get Sams to release his chokehold.  Sams allegedly struck Ballard several times when she tried to separate the two men. Around 4:36 a.m., Strickland made the last of several calls to 911 to report the fight and to request police assistance.

Steve Dunn, a supervisor at the Colleton County Sheriff's Department, was dispatched at 4:38 a.m., and he arrived at the scene around 4:46 a.m., some ten minutes after the last call for help was made.  He was met on the porch by Strickland, who told the officer, "They're in here," and led him to a bedroom on the right side of the trailer.  The officer observed two men lying face down on the floor, one on top of the other.  According to the officer, he drew his taser and ordered the man on top, Sams, to "Get off of him."  However, Sams did not release his grip on Frazier, who was not moving.  The officer ordered Sams to get up a second time, and Sams responded, "No, he'll want to fight."  The officer then ordered Sams a third time to get up.

---

[1]  The parties apparently were couples.  Frazier and Ballard were in a relationship and had a son.  Sams and Strickland had gone out a couple of times.  Sams and Frazier were cousins.  According to the women, the physical altercation began when Sams allegedly touched Ballard inappropriately.

At that point, Sams released Frazier and stood up.  When Sams got up, the officer observed Sams's "arms [had been] wrapped around the neck area of the victim" in an "arm lock."  Frazier was unresponsive and remained face down on the floor.  The officer handcuffed Sams and asked Strickland and Ballard to pull Frazier away from the wall and to roll him over on his back.

The officer noticed Frazier "was not breathing" and that he "had a blue cast to his skin."  The officer noted Frazier had shown no signs of life and had never made any movements.

Dr. Susan Presnell, a forensic pathologist, performed an autopsy and found Frazier had a number of bruises and scratches in his neck area.  She also observed that he had bruises in the underlying muscles of his neck, as well as a number of petechiae, or hemorrhages, in the lining of his eye and around the lining of his eyelid, all of which were indicative of strangulation.  Dr. Presnell determined Frazier's cause of death to be asphyxiation, or lack of oxygen, due to strangulation.

Sams was indicted for murder for the choking death of Frazier.  At trial, the circuit court instructed the jury on murder, the lesser-included offense of voluntary manslaughter, and self-defense.  The circuit court declined Sams's request to charge involuntary manslaughter.  The jury found Sams guilty of voluntary manslaughter.

Sams appealed, arguing the circuit court erred in denying his request to charge the jury on involuntary manslaughter.  The Court of Appeals affirmed.  This Court granted Sams's petition for a writ of certiorari.

## II.  STANDARD OF REVIEW

In criminal cases, appellate courts sit to review only errors of law.  *State v. Baccus*, 367 S.C. 41, 625 S.E.2d 216 (2006); *State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001).  Thus, an appellate court is bound by a trial court's factual findings unless they are clearly erroneous.  *Wilson*, 345 S.C. at 6, 545 S.E.2d at 829.

"The law to be charged to the jury is determined by the evidence presented at trial."  *State v. Hill*, 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993).  The trial court is required to charge a jury on a lesser-included offense if there is evidence from which it could be inferred that the defendant committed the lesser, rather than

the greater, offense. *State v. Drafts*, 288 S.C. 30, 340 S.E.2d 784 (1986); *see also Dempsey v. State*, 363 S.C. 365, 610 S.E.2d 812 (2005); *State v. Gourdine*, 322 S.C. 396, 472 S.E.2d 241 (1996).

"An appellate court will not reverse the trial [court]'s decision absent an abuse of discretion." *State v. Pittman*, 373 S.C. 527, 570, 647 S.E.2d 144, 166 (2007). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *Id.* at 570, 647 S.E.2d at 166-67. "The refusal to grant a requested jury charge that states a sound principle of law applicable to the case at hand is an error of law." *Id.* at 570, 647 S.E.2d at 167.

In determining whether the evidence requires a charge on a lesser-included offense, the Supreme Court must view the facts in the light most favorable to the defendant. *State v. Cole*, 338 S.C. 97, 525 S.E.2d 511 (2000). The charge request is properly rejected when there is no evidence tending to show the defendant was guilty of the lesser offense. *State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996); *State v. Cooney*, 320 S.C. 107, 463 S.E.2d 597 (1995); *State v. Gadsden*, 314 S.C. 229, 442 S.E.2d 594 (1994).

## III.  LAW/ANALYSIS

On appeal, Sams contends the Court of Appeals erred in determining there was no evidence to support a charge of involuntary manslaughter when he testified that he was attacked by Frazier and he "unintentionally strangled his friend while trying to restrain his friend." We disagree.

Sams was indicted for the offense of murder for killing Frazier by means of choking. *See* S.C. Code Ann. § 16-3-10 (2003) (defining "murder" as "the killing of any person with malice aforethought, either express or implied."). Voluntary and involuntary manslaughter are both lesser-included offenses of murder. *State v. Williams*, 399 S.C. 281, 731 S.E.2d 338 (Ct. App. 2012).

"Voluntary manslaughter is the unlawful killing of a human being in sudden heat of passion upon sufficient legal provocation." *Cole*, 338 S.C. at 101, 525 S.E.2d at 513. "Both heat of passion and sufficient legal provocation must be present at the time of the killing." *Id.* The sudden heat of passion need not dethrone reason entirely or shut out knowledge and volition, but it must be such as would naturally disturb the sway of reason and render the mind of an ordinary

person incapable of cool reflection and produce what may be called an uncontrollable impulse to do violence. *Id.* at 101-02, 525 S.E.2d at 513 (citing *State v. Byrd*, 323 S.C. 319, 474 S.E.2d 430 (1996)).

Involuntary manslaughter is defined as the unintentional killing of another without malice while engaged in either (1) the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm, or (2) the doing of a lawful act with a reckless disregard for the safety of others. *State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996); *see also* S.C. Code Ann. § 16-3-60 (2003) (stating a person charged with involuntary manslaughter may be convicted only upon a showing of criminal negligence, "defined as the reckless disregard of the safety of others").

Sams's theory at trial was essentially self-defense. Sams testified that he did not mean to kill Frazier and maintained he was just trying to restrain him to protect himself during their fight. However, Sams admitted that he held his arm around Frazier's neck and did not release his hold on him until the police officer arrived and ordered him to get off of Frazier. It is undisputed that more than ten minutes elapsed during this time.

In his appeal, Sams asserted the circuit court erred because the evidence arguably supported a factual finding that he unintentionally killed Frazier while acting in self-defense. The jury rejected Sams's argument of self-defense. The Court of Appeals rejected this contention as well and affirmed. *State v. Sams*, Op. No. 2011-UP-205 (S.C. Ct. App. filed May 4, 2011). The court observed Sams's appellate brief was scant and did not articulate which definition of involuntary manslaughter he believed was applicable, so it analyzed the case under both definitions. *Id.*, slip op. at *1.

On certiorari, Sams contends the Court of Appeals erred in finding there was no evidence to support the charge of involuntary manslaughter because he testified that he was attacked by his friend and unintentionally strangled his friend while trying to restrain him. Sams argues he was entitled to the charge under either definition of the offense.

As noted above, involuntary manslaughter is defined as the killing of another *without malice* and *unintentionally*, while one is engaged in *either* (1) the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm; *or* (2) the doing of a lawful act with a

reckless disregard of the safety of others.  *Tucker*, 324 S.C. at 170, 478 S.E.2d at 268.

At trial, defense counsel asked for a charge on involuntary manslaughter because the killing was unintentional and Sams might have been criminally negligent because, even if he wasn't really in danger, he believed that he was. Criminal negligence is statutorily defined as a reckless disregard of the safety of others.  *State v. Smith*, 315 S.C. 547, 446 S.E.2d 411 (1994) (citing S.C. Code Ann. § 16-3-60).

As an initial matter, we agree with the Court of Appeals that Sams never expressly asserted to the circuit court (or to the Court of Appeals) that his actions were *not* of a type naturally tending to cause great bodily harm or death.  Thus, we conclude the Court of Appeals should not have considered the first definition of involuntary manslaughter as it was not properly preserved.

To the extent Sams further claims on appeal to this Court that he did not "intend" to kill the victim by choking him and intended only to restrain him but was perhaps criminally negligent in doing so, we agree with the circuit court that this bald assertion of Sams's intent, i.e., that he meant no harm to Frazier, is not singularly dispositive of whether Sams is entitled to an instruction on involuntary manslaughter.  *See Smith*, 315 S.C. at 550, 446 S.E.2d at 413 (holding a murder defendant, who was convicted of the lesser-included offense of voluntary manslaughter, was not entitled to an instruction on involuntary manslaughter where the only evidence was that the defendant acted intentionally in wielding a knife during an argument in which he stabbed the victim; this Court stated whether the defendant "intended" to harm the victim was irrelevant);[2] *see also State v. Lowe*,

---

[2]  We cite *Smith* for our general observation that a defendant's assertion that he did not intend to harm the victim does not, *by itself*, entitle the defendant to an involuntary manslaughter instruction.  While *Smith* did, as the dissent points out, involve the use of a dangerous instrumentality, this fact is certainly not uncommon in death cases, and we disagree that it somehow invalidates the proposition espoused here, particularly where *Smith* and the cases footnoted by the dissent contain no language limiting their application.  To find otherwise would mean a defendant could automatically obtain the instruction merely by making a self-serving statement as to his intent.  Moreover, considering the fact that the defendant locked his arms tightly around the victim's neck, resulting in death by

318 S.W.3d 812, 820 (Mo. Ct. App. 2010) ("Generally, where the nature of the defendant's attack on the victim is such that it only supports the inference that he intended to kill or seriously injure the victim, the fact that the defendant denies an intention to kill is not sufficient to require an instruction for a lesser degree of the offense charged because the statements of [the] defendant are so unreasonable and inconsistent with physical facts and the conduct of the defendant that they do not support a finding of recklessness." (citing *State v. Mason*, 272 S.W.3d 257, 261 (Mo. Ct. App. 2010)); *State v. Mason*, 272 S.W.3d 257, 261 (Mo. Ct. App. 2008) ("Mason's disclaimer of any intent to kill the victim does not, in itself, require an instruction on involuntary manslaughter.").

Even if Sams *initially* intended only to "restrain" Frazier, at some point, when he maintained a chokehold on him for well over ten minutes, past the point when the victim had stated he could not breathe and then became limp, Sams's prolonged and continued hold on the victim's neck, until a responding officer repeatedly ordered Sams to release his hold, was intentional and the type of conduct that is highly likely to result in serious injury or death. We believe there is undoubtedly a distinction to be made between restraining someone, which Sams arguably did when he pinned Frazier down by lying on top of him, versus maintaining a prolonged chokehold around someone's neck, which undeniably carries with it the risk of serious harm within moments. The medical evidence also indicates the severe nature of the altercation, as there were objective signs of strangulation present, including bruising to the victim's neck and hemorrhages in his eyes. *Cf. People v. Leach*, 939 N.E.2d 537, 549-51 (Ill. App. Ct. 2010) (rejecting the defendant's assertion "that the evidence at best proved only the lesser offense of involuntary manslaughter in that he only acted recklessly in choking [his wife]"; the appellate court noted (1) it was "undisputed that [the] defendant

---

asphyxiation, we find the current appeal arguably involves a dangerous instrumentality, as one's hands or arms can, in certain circumstances, be deemed a dangerous weapon. *See, e.g., State v. Bennett*, 328 S.C. 251, 262, 493 S.E.2d 845, 851 (1997) (stating "we have held, in the context of murder, that a hand or fist may be considered a deadly weapon depending on the factual circumstances"). Although the dissent goes on to state "this case is more akin to cases where a struggle between the defendant and victim led to the unintentional death of the victim," the dissent itself then cites three cases, all of which involved a dangerous instrumentality. Thus, we do not believe its contentions in this regard have credence.

knowingly placed his hands on [his wife's] neck and exerted sufficient force to first render her unconscious and eventually dead"; (2) that the time frame for the choking incident, some three minutes, "created a strong probability of death or great bodily harm" of which the defendant had to be aware; and (3) the probability of harm was further supported by the medical evidence, which indicated continued pressure can cause a loss of consciousness within ten to thirty seconds and death within three to six minutes, and there were objective signs of strangulation, including trauma to the neck and hemorrhages in both eyes).

Sams's actions in choking the victim to the point of unconsciousness and then death ordinarily would be deemed unlawful under South Carolina law in the absence of self-defense.[3] *Cf. Bozeman v. State*, 307 S.C. 172, 414 S.E.2d 144 (1992) (stating the mere fact that the murder defendant had not aimed the pistol prior to firing it did not support a charge on the lesser-included offense of involuntary manslaughter, as firing a gun naturally intends to cause death or bodily harm, and it also does not fall into the second category of involuntary manslaughter because the defendant was not engaged in a lawful act; however, evidence that the victim swung a knife at the defendant immediately prior to the shooting supported a self-defense charge, which was given by the trial judge).

In *State v. Pickens*, 320 S.C. 528, 466 S.E.2d 364 (1996), the defendant was convicted of voluntary manslaughter, and we rejected his contention that he had acted lawfully but recklessly in defending himself and therefore was entitled to a jury charge on involuntary manslaughter. Pickens admittedly shot a gun, but asserted he had acted recklessly in his self-defense. We noted this case was distinguishable from those involving self-defense and the failure to charge voluntary manslaughter because in those cases a jury could "fail to find self-defense, but could find sufficient legal provocation and heat of passion to conclude the defendant was guilty of voluntary manslaughter." *Id.* at 532, 466 S.E.2d at

---

[3]  Although the parties and the Court of Appeals variously estimated Sams maintained his chokehold on Frazier for "over eight minutes" or "more than ten minutes," it is undisputed that the last of several 911 calls came in at 4:36 a.m., at which point Sams had already been lying on top of Frazier with his arms locked around Frazier's neck for an indeterminate period, and Sams still had Frazier in a chokehold when the officer arrived at the scene at 4:46 a.m. Thus, the choking incident lasted well over ten minutes, long enough to cause serious harm, as recognized by those present at the scene by the fact that they called 911.

366. In *Pickens*, we concluded that under our definition of involuntary manslaughter and in view of the facts alleged (the defendant and another person began shooting in self-defense when they were rushed by a group of people outside a Waffle House, resulting in two deaths and two others being injured), "the jury could not find [the defendant] had acted lawfully without finding self-defense." *Id.* at 532, 466 S.E.2d at 366-67.

Similarly, the Court of Appeals recently considered a defendant's assertion that "the trial court erred by not charging involuntary manslaughter because under his version of the facts, he unintentionally caused [the victim's] death when he lawfully but recklessly performed a martial arts move in self-defense." *State v. Scott*, 408 S.C. 21, 22, 757 S.E.2d 533, 534 (Ct. App. 2014). The Court of Appeals found "no basis to conclude Scott acted recklessly in defending himself because the circumstances Scott alleges to be reckless are the same circumstances that justified his use of force." *Id*

We recognize there is authority for the proposition that "a self-defense charge and an involuntary manslaughter charge are not mutually exclusive, as long as there is any evidence to support both charges." *State v. Light*, 378 S.C. 641, 650, 664 S.E.2d 465, 470 (2008). However, the quintessential situation where both involuntary manslaughter and self-defense have been justified involved circumstances, as in *Light*, where there was evidence of the negligent handling of a loaded gun or evidence that the defendant and the victim struggled over a weapon. *See id.* at 648-49, 664 S.E.2d at 469 (citing case law stating these particular factual scenarios support submission of both involuntary manslaughter and self-defense to a jury). Undoubtedly, determining when multiple charges are appropriate turns on the facts of each case, so there is no bright-line rule that can be universally applied. *Cf. State v. Williams*, 400 S.C. 308, 317, 733 S.E.2d 605, 610 (Ct. App. 2012) ("not[ing] even though self-defense and accident charges are often mutually exclusive, there is evidence in the record to support both charges").

In *Light* we concluded charges on involuntary manslaughter and self-defense were warranted "under the particular facts of the case." *Id.* at 651, 664 S.E.2d at 470. We found "[a]lthough [the defendant] had inconsistent stories," there was evidence the defendant was lawfully armed in self-defense where, according to the defendant, he took a loaded gun from the victim because the victim was threatening him with it, and there was evidence the defendant recklessly handled the gun because it fired almost as soon as he took possession of it. *Id.* at 648, 664

S.E.2d at 468-69.  Thus, "the jury [was] entitled to resolve the question of how the shooting actually occurred." *Id.* at 651, 664 S.E.2d at 470.  In doing so, we distinguished *Pickens*, noting in *Pickens* the defendant had admitted he intentionally shot his gun, but maintained he did so while acting lawfully but recklessly in defending himself, so he was not entitled to a charge on involuntary manslaughter.  *Id.* at 650, 664 S.E.2d at 469-70.  Similarly, in the current appeal, Sams argues that he acted lawfully in self-defense, but that he perhaps acted excessively and recklessly in doing so.  Under the facts presented, we agree with the circuit court and the Court of Appeals that Sams was not entitled to an instruction on involuntary manslaughter.

Sams's argument is tantamount to imperfect self-defense.  *See* 40 C.J.S. *Homicide* § 110 (2006) ("Under the 'imperfect self-defense' doctrine, the crime is reduced from murder to voluntary manslaughter where a defendant had a genuine but unreasonable fear of imminent peril from the victim, and killed the victim, or where the slayer, although acting in self-defense, was not himself or herself free from blame, as where he or she was the aggressor or used excessive force, although without murderous intent." (footnotes omitted)).  Even under that theory, however, a charge on involuntary manslaughter would not be warranted.  In *State v. Herrera*, 315 P.3d 343, 352 (N.M. Ct. App. 2013), the court noted that if a jury found the defendant used excessive force in response to any threat posed by the victim, it would be appropriate for a jury to find him guilty of voluntary manslaughter, rather than murder.  The court observed that what is sometimes called "imperfect self-defense" is a misleading term, as it is described as occurring when a person uses excessive force while otherwise lawfully engaging in self-defense.  *Id.*  The court stated the term is misleading because when a person kills another while engaging in imperfect self-defense, the killing is not legally justified. *Id.*  Thus, it is unlawful.  Rather, the concept simply presents an issue of mitigating circumstances that may reduce murder to voluntary manslaughter.  *Id.*

Heretofore, South Carolina has not expressly adopted the doctrine of imperfect self-defense.  *See generally State v. Finley*, 277 S.C. 548, 551, 290 S.E.2d 808, 809 (1982) (observing, in a case discussing the elements of self-defense, that the theory of "imperfect self-defense," which reduces an offense from murder to voluntary manslaughter, "is not the law in South Carolina").

In addition, Sams asserts it as a means to entitle him to a charge on *involuntary* manslaughter.  This Court has previously noted, however, that "[a]

claim of imperfect self-defense . . . has no application to involuntary manslaughter." *Douglas v. State*, 332 S.C. 67, 75 n.4, 504 S.E.2d 307, 311 n.4 (1998). Moreover, the view taken in most treatises and jurisdictions that have discussed the imperfect self-defense doctrine is that it serves to reduce a charge of murder to voluntary manslaughter (*not* involuntary manslaughter). Roy Moreland, *The Law of Homicide* 93 (1952); 40 C.J.S. *Homicide* § 110 (2006); *see also State v. Faulkner*, 483 A.2d 759 (Md. 1984) (stating self-defense is a complete defense to either murder or manslaughter that results in the acquittal of the defendant, whereas imperfect self-defense is not a complete defense, but is instead a factor in mitigation that reduces murder to voluntary manslaughter).

Thus, even if this Court were to accept the doctrine of imperfect self-defense, it is of no consequence to Sams's proceeding as it would, at most, entitle him to an instruction on voluntary manslaughter, which he already received. *See United States v. Skinner*, 667 F.2d 1306, 1209-10 (9th Cir. 1982) (holding a defendant's assertion that he used excessive force in defending himself could reduce a charge from murder to voluntary manslaughter, but not to involuntary manslaughter); *State v. Abeyta*, 901 P.2d 164, 172-73 (N.M. 1995) (stating the use of excessive force renders the action unlawful and the action cannot be deemed to be a lawful act done in an unlawful manner as required by the involuntary manslaughter statute), *abrogated on other grounds by State v. Campos*, 921 P.2d 1266 (N.M. 1996); *see also State v. Chatman*, 336 S.C. 149, 153, 519 S.E.2d 100, 102 (1999) ("Here, appellant was not acting lawfully, since he was engaged in an assault and battery, unless he was acting in self-defense.").

Based on the foregoing, we conclude Sams was not entitled to an instruction on involuntary manslaughter because, as found by the circuit court and the Court of Appeals, Sams's actions did not fall within the range of conduct constituting involuntary manslaughter in this state.

**AFFIRMED.**

**TOAL, C.J., KITTREDGE and HEARN, JJ., concur. PLEICONES, J., dissenting in a separate opinion.**

**JUSTICE PLEICONES:**  I respectfully dissent. In my view, the trial court erred in declining to give a charge on involuntary manslaughter and the Court of Appeals erred in affirming that decision.  I would reverse and remand for a new trial.

Involuntary manslaughter is defined as the unintentional killing of another without malice while engaged in either (1) the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm, or (2) the doing of a lawful act with a reckless disregard for the safety of others.  *State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996).  In determining whether the evidence requires a charge on a lesser included offense, the facts are viewed in a light most favorable to the defendant.  *State v. Byrd*, 323 S.C. 319, 321, 474 S.E.2d 430, 431 (1996).  A jury charge must be given if there is any evidence in the record to support the charge.  *State v. Tucker*, *supra*.

The majority holds that Sams was not entitled to an involuntary manslaughter charge because there is no evidence that Frazier's death was unintentional.  I disagree.  The majority states that Sams' testimony that he did not intend to kill Frazier is "not singularly dispositive" of his entitlement to a charge for involuntary manslaughter in this case.  I agree that this statement, standing alone, does not entitle Sams to such a charge.  It is, however, some evidence of one element of the offense of involuntary manslaughter, that is, that the victim's death was unintentional.  In addition, the circumstances under which the death occurred are such that the jury could have concluded that it was not Sams' intention to kill Frazier.  Further, in determining the existence of evidence of intent, I believe we err when we focus on whether the defendant intended to commit the act which led to the victim's death, rather than on whether he intended the consequence of his intentional act, that is, the victim's death.  As we have explained in defining involuntary manslaughter, "Recklessness is a state of mind in which the actor is aware of his or her conduct, yet consciously disregards a risk which his or her conduct is creating."  *State v. Pittman*, 373 S.C. 527, 571, 647 S.E.2d 144, 167 (2007) (internal citation omitted).

In my opinion, the facts of this case are more akin to those situations where a struggle between the defendant and the victim led to the unintended death of the victim. *See e.g. State v. Light,* 378 S.C. 641, 664 S.E.2d 465 (2008) (holding that an involuntary manslaughter charge was appropriate where defendant attempted to take gun from victim, and gun went off immediately after defendant jerked it away from the victim); *Tisdale v. State,* 378 S.C. 122, 662 S.E.2d 410 (2008) (holding that an involuntary manslaughter charge was warranted where defendant and victim fought for gun, and it "went off" while still in victim's hands). In this case, Sams testified that he never intended to hurt or kill Frazier, but rather that he sought merely to restrain him until the police arrived. This is evidence from which a jury could find the restraint was done with reckless disregard of Frazier's safety. In my opinion, viewing the evidence in the light most favorable to Sams as we must, an involuntary manslaughter charge was warranted in this case. *State v. Byrd*, *supra*; *State v. Tucker*, *supra*.

Finally, I disagree that the jury could not find that Sams had acted lawfully without also finding that he acted in self-defense. As we have repeatedly held, a jury charge on both self-defense and involuntary manslaughter may be given on the same record.[4] While the majority suggests Sams would be entitled to an involuntary manslaughter charge only under a theory of imperfect self-defense, I find evidence in this record from which a jury could find either self-defense or involuntary manslaughter.[5]

---

[4] *See State v. Crosby,* 355 S.C. 47, 584 S.E.2d 110 (2003) (improper to hold that any evidence of an intentional shooting negates evidence from which any other inference may be drawn); *Casey v. State,* 305 S.C. 445, 409 S.E.2d 391 (1991) (error by trial court in not charging involuntary manslaughter, even though the trial court charged murder, voluntary manslaughter, accident, and self-defense).

[5] It is true, as the majority states, that this Court in *Douglas v. State*, 332 S.C. 67, 75, 504 S.E.2d 307, 311 (1998) fn. 4, indicated that a claim of imperfect self-defense has no application to involuntary manslaughter. *Douglas* cites McAninch, *The Criminal Law of South Carolina* 163 (3rd Ed. 1996) as authority for this proposition. In this passage, however, McAninch cites only *State v. Finley*, 277

For these reasons, I would reverse and remand for a new trial.

---

S.C. 548, 290 S.E.2d 808 (1982) as rejecting imperfect self-defense as a means to reduce a murder to manslaughter. In *Finley*, the defendant sought only a voluntary manslaughter charge, not an involuntary manslaughter charge. In my opinion, it is more accurate to say we have not yet decided whether imperfect self-defense can support an instruction on involuntary manslaughter as *Finley* did not address that issue.