# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Lance Antonio Brewton, Appellant.

Appellate Case No. 2018-001572

—————————

Appeal From Spartanburg County
J. Derham Cole, Circuit Court Judge

—————————

Opinion No. 5912
Heard November 10, 2021 – Filed May 25, 2022

—————————

## AFFIRMED

—————————

Appellate Defender Adam Sinclair Ruffin, of Columbia,
for Appellant.

Attorney General Alan McCrory Wilson and Senior
Assistant Deputy Attorney General William M. Blitch,
Jr., both of Columbia, and Solicitor Barry J. Barnette, of
Spartanburg, all for Respondent.

—————————

**KONDUROS, J.:** Lance Antonio Brewton appeals his convictions for murder and
possession of a firearm during the commission of a violent crime. Brewton
contends the trial court erred by (1) failing to instruct the jury on the lesser
included offense of involuntary manslaughter and the defense of accident; (2)
prohibiting his testimony regarding witchcraft and hearing voices in his head; and
(3) allowing the State to impeach him with his 1999 robbery conviction. We
affirm.

**FACTS**

On the morning of September 25, 2017, Brewton arrived at Natalie Niemitalo's house.  Brewton and Niemitalo had been in an on-again, off-again relationship for two years.  After their friend Kevin Schuerman arrived, the three decided to go purchase cigarettes and drinks.  Niemitalo got into the driver's seat of her mother's black, two-door Honda Civic, Brewton got into the back seat on the passenger side, and Schuerman got into the passenger seat.

Once in the car, Niemitalo began putting on makeup.  After about five minutes, Brewton exited the car, walked around to the driver's side, and began arguing with Niemitalo because he wanted to drive.  Shortly after the argument began, Schuerman heard a gunshot.  Schuerman exited the car and ran towards Niemitalo's garage because he thought he had been shot.  After Schuerman realized he had not been shot, he returned to the driveway and watched Brewton pull Niemitalo out of the car, get into the driver's seat, and drive away.

Schuerman approached Niemitalo and saw she was gasping for air and in pain.  Schuerman called 9-1-1 and held a towel on Niemitalo's wound until first responders arrived.  While first responders were treating Niemitalo, Brewton drove by her house in the Honda Civic.  Brewton drove by Niemitalo's house a second time, and an officer initiated a traffic stop by turning on his blue lights; however, Brewton continued driving for twenty-three miles.  Officers apprehended Brewton after he collided with a vehicle in the driveway of his home.

First responders airlifted Niemitalo to a hospital, but she died from a single gunshot wound.  The doctor that performed Niemitalo's autopsy determined she bled to death after a bullet entered her upper-left torso and exited nine-and-a-half inches lower on the right side of her back.  Police collected physical evidence associated with the shooting including the Honda Civic, Brewton's gun, a fired bullet, and a spent shell casing.  Brewton was indicted for murder, possession of a firearm during the commission of a violent crime, escape, driving under suspension, and failure to stop when signaled by an officer using a blue light.

A forensic psychologist evaluated Brewton and determined he was competent to stand trial for an unrelated federal weapons charge.[1]  In a pretrial motions hearing, the State presented Brewton's mental evaluation and moved to prevent him from

---

[1] The incident leading to Brewton's federal conviction for "Possession of a Firearm by a Convicted Felon" occurred nine days before Niemitalo's death.

presenting any evidence regarding mental illness or hearing voices. The State argued any testimony about mental illness or hearing voices would not be relevant because the forensic psychologist concluded Brewton did not have a mental illness and was competent to stand trial. Alternatively, the State contended that if the testimony was relevant, it would be highly prejudicial.

Brewton argued he was not presenting the testimony about hearing voices as a defense for his actions; rather, Brewton argued he should be allowed to present the testimony as an alternative explanation to the State's assertion that he fled due to a guilty mind. Initially, the trial court indicated the testimony would not be relevant and would confuse the jury because Brewton did not suffer from a mental illness; however, the trial court delayed making a final determination until after Brewton proffered the testimony.

Additionally, the State disclosed it planned to introduce Brewton's federal weapons conviction and two common law robbery convictions from 1999 and 2008. Brewton argued the federal weapons conviction was not relevant, but the State maintained it would preclude an accident jury instruction because Brewton was not allowed to possess a weapon. Brewton also moved to prevent the State from using any remote convictions; again, the trial court delayed making a final determination.

Brewton proceeded to trial for murder and possession of a weapon during the commission of a violent crime after he pled guilty to escape, driving under suspension, and failing to stop when signaled by an officer. Schuerman testified that Brewton was "acting erratic" and "on edge" when he got to Niemitalo's house but recalled Brewton's behavior had not concerned him. Schuerman stated the argument between Brewton and Niemitalo was not out of the ordinary and elaborated he had seen Brewton and Niemitalo in worse arguments; however, Schuerman clarified he had never seen any violence during their arguments. Schuerman also testified he did not see Brewton with a gun the morning of Niemitalo's death.

An expert in firearm examination, Chad Smith, testified the gun involved did not have an external safety mechanism, which is typically thought of as a button that would prevent the gun from firing. Smith explained the gun would fire once five-and-a-half pounds of pressure was applied to its trigger, even if the pressure was applied unintentionally. Smith opined:

> The trigger guard is here . . . to guard that trigger from
> any kind of unintentional pressure against the trigger.

> But I suppose . . . something . . . could enter into the
> trigger guard . . . and if the firearm was pushed against
> that object and enough pressure . . . [was] exerted on that
> trigger, then it could fire.

Still, Smith explained the gun would not fire unless its slide had been pulled back while it was loaded with ammunition. Smith testified he performed several tests on the weapon and concluded the recovered bullet and spent shell casing both came from Brewton's gun.

At the conclusion of the State's case-in-chief, Brewton proffered his testimony regarding witchcraft and hearing voices in his head. Brewton testified he believed Niemitalo's mother and her friend Aaron[2] practiced witchcraft and one of them had cast a spell on him that caused him to hear the voices. Brewton admitted Niemitalo's mother denied practicing witchcraft and Niemitalo never told him her mother practiced witchcraft; nevertheless, Brewton believed Niemitalo's mother practiced witchcraft because he believed she had also cast a spell on Aaron and Niemitalo told him she knew about the voices. Brewton estimated he had intermittently been under a spell for eight or ten months.

Brewton described "experiencing paranoia" at Niemitalo's house on the morning of her death because the voices were telling him his family was being murdered. Brewton explained he got in the car's back seat because the voices were telling him people were trying to kill him. Brewton testified that while the group was sitting in the car, he observed a cement truck drive past Niemitalo's house, and the voices told him it was going to bury his family alive.

Brewton recalled he wanted to drive so he could follow the cement truck, and he felt that Niemitalo was not putting on her makeup "fast enough." Brewton stated he left Niemitalo's house to find the cement truck. Brewton explained he did not stop to check on Niemitalo the first time he drove by her house because paramedics were already there and he wanted to keep looking for the cement truck. Brewton testified he drove by Niemitalo's house a second time because he could not find the cement truck and the voices had stopped speaking to him. Brewton admitted he did not stop the second time because police officers were there and he had drugs in the car.

---

[2] The record does not contain Aaron's surname.

The State objected to Brewton's proffer at its conclusion and argued it was filled with hearsay, not relevant, and highly prejudicial if relevant. Brewton responded he had the absolute right to testify, the hearsay would be omitted in front of the jury, and the probative value of his testimony would not be substantially outweighed by unfair prejudice. Brewton insisted he should be allowed to give an alternative reason for leaving the scene other than a guilty mind.

The trial court ruled Brewton could not testify about witchcraft or hearing voices. The trial court found Brewton's proffer was largely based on hearsay and the danger of unfair prejudice substantially outweighed any probative value because it seemed to give rise to an unasserted mental illness defense. Additionally, the trial court determined Brewton's right to testify was not violated because he was not entirely prevented from testifying. The trial court explained Brewton could testify he was fearful and felt like he needed to leave Niemitalo's house.

After Brewton elected to testify,[3] the trial court ruled both of his robbery convictions were admissible because they were part of a "continuous course of conduct." The trial court also ruled that if the convictions were remote, their probative value substantially outweighed any danger of unfair prejudice. Brewton argued his 1999 conviction was remote because it was a separate charge from his 2008 conviction. The trial court reiterated Brewton's convictions were a continuous criminal history because they were similar offenses that all occurred without a passage of ten years. Brewton maintained his 1999 conviction was remote because he finished serving that sentence in 2004 and he would be testifying in 2018. Brewton also asserted the probative value of that conviction was outweighed by unfair prejudice because there was limited value in attacking his credibility.

However, Brewton asked the trial court if his convictions would be referred to as common law robbery convictions or as crimes involving dishonesty. The State responded it was willing to refer to the convictions as crimes of dishonesty, and the trial court concluded the convictions would be referred to as crimes of dishonesty. Brewton did not object.

---

[3] The record indicates Brewton stated "I will not testify" after the trial court prohibited him from testifying about witchcraft and the voices. However, this appears to be a scrivener's error because Brewton went on to testify and it was not mentioned on appeal.

Brewton's testimony was mostly consistent with Schuerman's, but Brewton admitted he was not legally allowed to possess a weapon, he had been on a drug binge that made him unable to sleep for the three days preceding Niemitalo's death, and he had used drugs the morning of Niemitalo's death. Brewton also testified that his gun fell out of his pocket as he got out of the car. Brewton explained he kept the gun in his hand after he picked it up because he assumed Niemitalo was going to let him drive and he preferred to keep it in the car's center console while driving.

Brewton maintained he did not intentionally kill Niemitalo and claimed "the gun went off" when Niemitalo pushed his hand back as he reached into the car to grab its keys. Brewton testified he did not stop when signaled by officers because he had drugs in the car. Brewton explained he drove all the way to his house because he was afraid officers would shoot him. At the end of his direct examination, Brewton admitted he had been convicted of two crimes of dishonesty. The State did not mention crimes of dishonesty during its cross-examination of Brewton.

After the defense rested, Brewton requested the trial court instruct the jury on involuntary manslaughter and accident. The State objected and asserted (1) an involuntary manslaughter instruction was improper because Brewton was not armed in self-defense and (2) an accident instruction was improper because Brewton was not legally able to possess a weapon. Brewton argued that even though his possession of the gun was unlawful, it was not the proximate cause of Niemitalo's death.

The trial court declined to instruct the jury on either involuntary manslaughter or accident. The trial court reasoned Brewton was acting unlawfully by possessing the gun and trying to take the car from Niemitalo. Additionally, the trial court concluded Brewton was not exercising reasonable care in handling the gun. Following jury deliberations, Brewton was convicted of murder and possession of a firearm during the commission of a violent crime. The trial court sentenced Brewton to life in prison without the possibility of parole. This appeal followed.

**STANDARD OF REVIEW**

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). "The conduct of a criminal trial is left largely to the sound discretion of the trial judge, who will not be reversed in the absence of a prejudicial abuse of discretion." *State v. Bryant*, 372 S.C. 305, 312, 642 S.E.2d 582, 586 (2007). "An abuse of discretion occurs when a

trial court's decision is unsupported by the evidence or controlled by an error of law." *Id.*

## LAW/ANALYSIS

### I. Jury Instructions

Brewton argues the trial court erred by failing to give an involuntary manslaughter jury instruction because Brewton testified the shooting was unintentional and the record contained sufficient evidence Brewton acted recklessly in handling the gun. Brewton contends the trial court erred by failing to give an accident jury instruction because he testified the shooting was unintentional and the record contained sufficient evidence he used due care in handling the gun. Brewton maintains his illegal possession of a firearm did not preclude either jury instruction because his illegal possession did not proximately cause Niemitalo's death. We disagree.

"[T]he trial court is required to charge only the current and correct law of South Carolina." *State v. Marin*, 415 S.C. 475, 482, 783 S.E.2d 808, 812 (2016) (alteration in original) (quoting *State v. Brandt,* 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011)). "The law to be charged to the jury is determined by the evidence presented at trial." *State v. Brown*, 362 S.C. 258, 261-62, 607 S.E.2d 93, 95 (Ct. App. 2004) (quoting *State v. Hill,* 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993)). "If there is any evidence to support a jury charge, the trial [court] should grant the request." *Id.* at 262, 607 S.E.2d at 95. "To warrant reversal, a trial [court]'s refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant." *Id.*

> Involuntary manslaughter is a lesser-included offense of murder, and "is defined as the unintentional killing of another without malice while engaged in either (1) the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm, or (2) the doing of a lawful act with a reckless disregard for the safety of others."

*State v. Scott*, 414 S.C. 482, 487, 779 S.E.2d 529, 531 (2015) (quoting *State v. Sams*, 410 S.C. 303, 309, 764 S.E.2d 511, 514 (2014)).

"If there is any evidence warranting a charge on involuntary manslaughter, then the charge must be given." *State v. Wharton*, 381 S.C. 209, 216, 672 S.E.2d 786, 789 (2009). "In determining whether to charge the lesser included offense of manslaughter[,] the court must view the evidence in the light most favorable to the defendant." *State v. Gibson*, 390 S.C. 347, 356, 701 S.E.2d 766, 770 (Ct. App. 2010). "Declining to charge the lesser included offense is warranted when it 'very clearly appear[s] that . . . *no evidence whatsoever* [exists] tending to reduce the crime from murder to manslaughter.'" *Id.* (alterations in original) (quoting *State v. Brayboy*, 387 S.C. 174, 179, 691 S.E.2d 482, 485 (Ct. App. 2010)).

Additionally, "[f]or a homicide to be excusable on the ground of accident, it must be shown that the killing was unintentional, the defendant was acting lawfully, and due care was exercised in the handling of the weapon." *Wharton*, 381 S.C. at 216, 672 S.E.2d at 789. "Evidence of an accidental discharge of a gun will support a charge of accident where the defendant lawfully arms himself in self-defense." *Id.*

"[U]nlawful possession of a firearm can . . . constitute an unlawful activity . . . [that] preclude[s] an accident defense if it is the proximate cause of the killing." *State v. Burriss*, 334 S.C. 256, 262 n.5, 513 S.E.2d 104, 107 n.5 (1999). "[I]t would be incongruous not to apply this same reasoning in the context of involuntary manslaughter." *Id.* at 265, 513 S.E.2d at 109. "[T]he State [must] prove beyond a reasonable doubt that the unlawful act in which the [defendant] was engaged was at least the proximate cause of the homicide." *Id.* at 262, 513 S.E.2d at 107 (quoting *State v. Goodson*, 312 S.C. 278, 280 n.1, 440 S.E.2d 370, 372 n.1 (1994)).

The issue of whether a defendant is entitled to involuntary manslaughter and accident jury instructions despite unlawfully possessing a firearm was developed in *Goodson* and *Burriss*. In *Goodson*, our supreme court determined the illegally armed defendant was not entitled to an accident jury instruction. 312 S.C. at 281, 440 S.E.2d at 372. In that case, the defendant was drinking while playing pool at a bar and got into an argument with another player over a bet. *Id.* at 279, 440 S.E.2d at 371. The other player threatened the defendant with a pool stick, and the defendant responded by drawing a gun from his pocket. *Id.* The bar's owner intervened and escorted the defendant outside. *Id.* While outside, the defendant shot and killed the owner. *Id.* at 279, 440 S.E.2d at 371-72. The defendant claimed the gun "just went off" as the owner approached him. *Id.* at 279, 440 S.E.2d at 372.

The *Goodson* court rejected the State's proposition that unlawful possession of a firearm always precluded an accident jury instruction. *Id.* at 280 n.1, 440 S.E.2d at 372 n.1. The *Goodson* court noted the State must prove beyond a reasonable doubt the defendant's unlawful act proximately caused the homicide. *Id.* However, the *Goodson* court reasoned the defendant was not entitled to an accident jury instruction because he did not present any evidence that he was lawfully acting in self-defense. *Id.* at 281, 440 S.E.2d at 372.

In a concurring opinion, Justice Toal stated she would have held the defendant was not entitled to an accident jury instruction because he was not lawfully armed when he shot the victim. *Id.* at 281, 440 S.E.2d at 372-73 (Toal, J., concurring). Justice Toal reasoned any right the defendant had to be armed due to the dispute with the other pool player ended when the owner removed him from that situation. *Id.* at 282, 440 S.E.2d at 373 (Toal, J. concurring). Still, Justice Toal agreed with the majority that the defendant's unlawful possession must have proximately caused the victim's injury to preclude an accident jury instruction. *Id.* (Toal, J., concurring). Justice Toal concluded "where, as here, the defendant unlawfully possesses a firearm, has been drinking heavily all day, and kills the [victim] with the unlawful firearm, the unlawful possession of the firearm is a proximate cause of the injury." *Id.* (Toal, J., concurring).

In *Burriss*, our supreme court held the illegally armed defendant was entitled to involuntary manslaughter and accident jury instructions. 334 S.C. at 264-65, 513 S.E.2d at 109. In that case, two men attempted to rob the defendant. *Id.* at 258, 513 S.E.2d at 106. After the attackers threw the defendant to the ground, the defendant drew a gun from his pocket and fired two shots into the ground. *Id.* at 258-59, 513 S.E.2d 106. The attackers initially backed away, but one of the attackers advanced again as the defendant was getting up. *Id.* at 259, 513 S.E.2d 106. When the defendant picked up his gun, it fired a shot that killed the advancing attacker. *Id.*

The *Burriss* court agreed with Justice Toal's analysis in her *Goodson* concurrence and clarified *Goodson* as holding "unlawful possession of a firearm can . . . constitute an unlawful activity . . . [that] preclude[s] an accident defense if it is the proximate cause of the killing." *Id.* at 262 n.5, 513 S.E.2d at 107 n.5. The *Burriss* court reasoned "a person can be acting lawfully, even if he is in unlawful possession of a weapon, if he was entitled to arm himself in self-defense at the time of the shooting." *Id.* at 262, 513 S.E.2d at 108. Further, the *Burriss* court determined "it would be incongruous not to apply this same reasoning in the context of involuntary manslaughter." *Id.* at 265, 513 S.E.2d at 109. The *Burriss*

court concluded the defendant was entitled to both accident and involuntary manslaughter jury instructions because evidence in the record supported his claim that he was lawfully armed in self-defense when the shooting occurred. *Id.* at 262-63, 265, 513 S.E.2d at 108-09.

Here, the trial court did not err by refusing to give involuntary manslaughter or accident jury instructions. Brewton directs this court to *State v. Slater*[4] and *State v. Williams*[5] as support for his proposition that his illegal possession of a weapon did not preclude involuntary manslaughter or accident jury instructions. However, we find those cases inapplicable because they revolved around whether the defendants were lawfully armed in self-defense. *See Slater*, 373 S.C. at 71, 644 S.E.2d at 53 (noting "where the defendant's unlawful possession of a weapon is merely incidental to the defendant's lawful act of arming himself in self-defense, the unlawful possession of the weapon will not prevent the use of an accident defense"); *Williams*, 427 S.C. at 254 n.4, 830 S.E.2d at 908 n.4 (clarifying "the question is whether [the weapon] is the proximate cause of the 'difficulty' or 'occasion' that led to the killing" in determining whether a defendant is precluded from a self-defense jury instruction).

In stark contrast to the defendants' arguments in *Goodson*, *Burriss*, *Slater*, and *Williams*, Brewton does not argue he was lawfully armed in self-defense. Indeed, this record contains no evidence Brewton was defending himself at the time of the shooting. Brewton and Schuerman both testified Brewton and Niemitalo were arguing but not physically fighting. Further, Brewton testified the gun fired when Niemitalo pushed his hand back as he reached for the car keys; Brewton did not testify that Niemitalo attempted to take or control the gun. Consequently, like the defendant in *Goodson*, Brewton presented no evidence he was lawfully armed in self-defense.

Therefore, the dispositive question of this issue is whether Brewton's illegal possession proximately caused Niemitalo's death; we determine it did. Like the defendant in *Goodson*, Brewton admitted he was unlawfully handling a loaded firearm while intoxicated. Brewton testified he had been on an illegal drug binge that prevented him from sleeping the three days preceding Niemitalo's death; Brewton also admitted he used illegal drugs the morning of Niemitalo's death.[6] Additionally, Brewton testified the gun fell out of his pocket as he got out of the

---

[4] 373 S.C. 66, 644 S.E.2d 50 (2007).

[5] 427 S.C. 246, 830 S.E.2d 904 (2019).

[6] The record indicates the shooting also occurred during the morning hours.

car, he held the gun in his hand while arguing with Niemitalo, and he still held the gun in his hand when he reached into the car to take its keys. Further, Brewton held a gun that would fire once it had five-and-a-half pounds of pressure applied to its trigger, even if that pressure was unintentional. Finally, like the defendant in *Goodson*, Brewton's illegally possessed gun fired the shot that killed Niemitalo. Therefore, Brewton's unlawful possession proximately caused Niemitalo's death. Accordingly, we affirm the trial court's decision to refuse to instruct the jury on involuntary manslaughter and accident.[7]

## II. Brewton's Proffered Testimony

Brewton asserts the trial court erred by prohibiting him from testifying about witchcraft and hearing voices. Brewton contends he should have been able to testify the voices caused him to flee the scene after the shooting. Brewton argues that testimony was relevant to rebut the State's assertion that he fled the scene due to a guilty conscience, which allowed the jury to infer malice. Brewton insists his inability to explain the cause of his flight to the jury in his own words violated his fundamental right to testify in his own defense. We disagree.

"[A]n exception to the trial court's ruling will be deemed abandoned where the appellant fails to specifically argue it in his brief." *State v. Black*, 319 S.C. 515, 518 n.2, 462 S.E.2d 311, 313 n.2 (Ct. App. 1995). "[S]hort, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not presented for review." *State v. Jones*, 392 S.C. 647, 655, 709 S.E.2d 696, 700 (Ct. App. 2011) (quoting *Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691 (Ct. App. 2001)). "[A]n unappealed ruling, right or wrong, is the law of the case." *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012); *see also State v. Williams*, 427 S.C. 148, 157, 829 S.E.2d 702, 706-07 (2019) (explaining an unappealed jury instruction became the law of the case).

Here, the trial court limited the scope of Brewton's testimony to prohibit the jury from hearing about witchcraft and hearing voices because it determined his testimony (1) was largely based on hearsay and (2) would result in unfair prejudice by confusing the jury. The trial court also determined prohibiting Brewton from

---

[7] Additionally, Brewton was precluded from an accident jury instruction because he was not exercising due care in handling the weapon. *See Wharton*, 381 S.C. at 216, 672 S.E.2d at 789 (stating a defendant must have been exercising due care in handling the weapon for a homicide to be excusable by accident).

testifying about witchcraft and hearing voices did not violate his right to testify because Brewton was not entirely prohibited from testifying; indeed, Brewton testified in his own defense.

While Brewton objected to the trial court's ruling on all grounds, he only argues on appeal that his right to testify was violated. Brewton's brief provides no authority regarding the trial court's ruling that Brewton's proffered testimony was largely based on hearsay and would result in unfair prejudice. Consequently, Brewton abandoned his arguments that his proffered testimony was not hearsay and would not result in unfair prejudice. As a result, the trial court's ruling that Brewton's proffered testimony was hearsay and unfairly prejudicial became the law of the case. Accordingly, we affirm the trial court's decision to prohibit Brewton from testifying about witchcraft and hearing voices.

## III. Impeachment

Brewton asserts the trial court erred by allowing the State to impeach him with his 1999 common law robbery conviction. Brewton contends that conviction was remote because his sentence expired in 2004 and he testified in 2018. Additionally, Brewton argues the trial court did not conduct the required *State v. Colf*[8] analysis. We disagree.

"To preserve an issue for review[,] there must be a contemporaneous objection that is ruled upon by the trial court." *State v. Johnson*, 363 S.C. 53, 58, 609 S.E.2d 520, 523 (2005). An appellant is barred from arguing an issue on appeal if trial "counsel acquiesced [to a ruling] . . . and made no other objections regarding [that ruling] . . . ." *State v. Mitchell*, 330 S.C. 189, 195, 498 S.E.2d 642, 645 (1998); *see also State v. McKinney*, 258 S.C. 570, 190 S.E.2d 30 (1972) (finding the appellant waived his objection to certain testimony by cross-examining a witness regarding that testimony without reserving his previous objection).

Brewton ultimately waived for appellate review his contention the trial court erred by allowing the State to impeach him with his 1999 common law robbery conviction. Brewton initially objected to the trial court's ruling that the State could impeach him with his 1999 conviction and argued it was remote. However, Brewton asked if his convictions would be referred to by their name or as crimes of dishonesty. The State agreed to refer to both convictions as crimes of dishonesty,

---

[8] 337 S.C. 622, 525 S.E.2d 246 (2000).

and the trial court allowed both convictions to be referred to as crimes of dishonesty.  Critically, Brewton did not object or reserve his previous objection.

Brewton testified on direct examination he had been convicted of two crimes of dishonesty.  Before the parties presented their closing arguments, Brewton renewed all of his objections; however, the record indicates the trial court did not respond.  In its closing argument, the State referred to Brewton's convictions as crimes of dishonesty.  Again, Brewton did not object.  Consequently, Brewton waived his objection that his 1999 conviction was remote because he acquiesced to referring to it as a crime of dishonesty.

**CONCLUSION**

In short, the trial court properly refused to instruct the jury on involuntary manslaughter and accident.  Additionally, the trial court's decision to prohibit Brewton's proffered testimony became the law of the case.  Finally, Brewton failed to preserve for appellate review the trial court's decision to allow the State to impeach him with his 1999 conviction.  Accordingly, Brewton's convictions for murder and possession of a firearm during the commission of a violent crime are

**AFFIRMED.**

**HILL and HEWITT, JJ., concur.**