23180

The STATE, Respondent v. Lucille MYERS and
Winston David Myers, Jr., Appellants.

(391 S.E. (2d) 551)

Supreme Court

*Joseph L. Savitz, III, of S.C. Office of Appellate Defense,* Columbia, *Andrew J. Savage, III,* Charleston, and *Timothy Clay Kulp,* North Charleston, *for appellants.*

*Attorney General T. Travis Medlock, Asst. Atty. Gen. Harold M. Coombs, Jr., Staff Atty. Gwendolyn L. Fuller,* Columbia, and *Sol. Joseph P. Mizzell, Jr.,* Orangeburg, *for respondent.*

Heard Oct. 31, 1989.

Decided March 19, 1990.

TOAL, Justice:

The primary issue which we address in this appeal is whether, under the circumstances of this case, the trial judge abused his discretion in refusing to qualify an expert witness for the defense. We hold that he did abuse his discretion, and we reverse and remand this case for a new trial.

## FACTS

On April 20, 1987, shortly after midnight, Winston David Myers, Sr. died from multiple blunt instrument wounds to the face and head. It is unclear from the evidence and testimony whether the appellant Winston David Myers, Jr. (David) was the sole killer, or whether he and his mother, appellant Lucille Myers, acted in concert to bring about the victim's death.

Lucille and Winston Myers had been married for over twenty-six years at the time of Winston's death. Lucille testified that throughout the course of the marriage, Winston beat her and abused her, threatening her with death many times. Much of the time, Lucille testified, the abuse was connected to Winston's drinking. Former neighbors corroborated Lucille's allegations that Winston choked her numerous times, beat her, and pursued her when she attempted to flee from his attacks. Winston was also said to have attacked his son David many times, including instances where he punched his son in the mouth, and where he assaulted him despite the fact that at the time of the assault, David was still recuperating from an automobile accident.

Lucille and a former neighbor testified that Winston was a very strong man, weighing approximately two hundred pounds. He was said to be much stronger than Lucille and David. On many occasions, David and Lucille, as well as David's sister Tammie, had to rush to each other's aid to protect one another from Winston's wrath. Police were called to the scene by neighbors and by Lucille many times.

Yet, the family continued to live with Winston, Lucille testifying that she loved her husband very much, and that there were many good times in their marriage to help balance out the bad. Indeed, Lucille testified that there were lengthy periods during the marriage when Winston was not drinking and when he never abused the family. During the latter years of the marriage however, up until Winston's death, the Myers family was embroiled in ever-increasing violence. There was evidence at trial that Winston had threatened to kill Lucille if she ever attempted to leave him. Lucille produced a tape recording at trial which further substantiated Winston's

violent nature and propensity for physical abuse. Two clinical psychologists testified at trial that the case of Lucille and David manifested the classic characteristics of violent familial abuse, and that both Lucille and David believed that they were in great danger from Winston.

On April 11, 1987, Tammie got married. The day after the wedding, Lucille and Winston moved into the mobile home where Winston was to die a week later. By all accounts, this mobile home was isolated. There was no phone in the trailer. The nearest neighbors were approximately four hundred yards away. There appears to have been only one feasible entrance into the trailer, that being the front door.

On the day of Winston's death, Lucille had apparently become very angry with Winston because of her belief that he was having an affair. After noting that Winston was at a place called Jellico's Landing with a woman she suspected as being his paramour, Lucille took a pile of Winston's clothes and dumped them on the ground at Jellico's, cursing Winston and telling him he could stay there instead of at their home. That night, Winston came home demanding to be let inside. He was let in, and Lucille testified that he told her he would kill her if she did not go back to pick up his clothes at Jellico's. Lucille stated that Winston then hit her several times, opened the trailer door, and then threw her out of the trailer to the ground. By the time she got back inside, Lucille testified, David and Winston were fighting on the floor. Winston was allegedly getting the better of his son, choking him, cursing him, and threatening to kill him. In vain, Lucille hit Winston with a baseball bat in an attempt to stop the fight. Lucille allegedly left to go phone for help, and when she returned, she saw that David had mortally wounded Winston by hitting him with a brass duck figurine. She testified that David was in psychological shock, and she told him to leave. Winston died shortly afterwards. An autopsy revealed that he had been drinking shortly before his death.

At trial, Lucille and David claimed that they killed Winston in self-defense, pointing out that there were guns and knives in the trailer at their disposal if they had wanted to trap Winston and murder him. A jury convicted them of voluntary manslaughter and they were sentenced to twelve years confinement.

## LAW/ANALYSIS

A. *Directed Verdict*

On appeal, the appellants argue that the trial judge erred in failing to grant their motion for a directed verdict of acquittal. We disagree. The State pointed out that after the killing, David disposed of the duck figurine in some bushes, and that Lucille admitted, contrary to her testimony, that she killed Winston. The State also noted comments made by Lucille and David before the killing that they wanted to see Winston dead and would one day kill him. Further, witnesses for the State testified that after the killing the trailer appeared neat and did not evidence a great struggle. In reviewing refusals to grant a motion for a directed verdict of acquittal, the reviewing court must examine the evidence in the light most favorable to the State. *State v. Mathis*, 287 S.C. 589, 340 S.E. (2d) 538 (1986). Applying this principle, we find no error by the trial court in submitting this case to the jury.

B. *Disqualification of Expert*

The appellants assert next that the trial court erred in refusing to qualify one of their first witnesses, Judy Koelpin, as an expert in the field of blood spatter patterns and their interpretation. We agree.

The record reveals that Mrs. Koelpin had been a forensic science investigator for eight years. She had attended approximately one hundred forensic crime scenes and assisted with one thousand or more autopsies. It was Ms. Koelpin's responsibility to assist the pathologist and collect evidence directly related to the body. In 1985, Ms. Koelpin attended a one week seminar on the characteristics of blood stain evidence taught by one Professor Herbert McDonald, who, according to Ms. Koelpin, had "done extensive investigations into this" and "written a booklet" on the subject. Ms. Koelpin admitted that she had never testified in court before on blood pattern interpretations. Based on the above, the trial judge ruled that Ms. Koelpin was not qualified as an expert.

The qualification of a witness as an expert falls largely within the discretion of the trial judge. *State v. Caldwell*, 283 S.C. 350, 322 S.E. (2d) 662 (1984). It is

incumbent upon the party offering the expert to show that his witness possesses the necessary learning, skill, or practical experience to enable him to give opinion testimony. *State v. Moorer*, 241 S.C. 487, 129 S.E. (2d) 330 (1963). However, we have made it clear that, generally, defects in the amount and quality of education or experience go to the weight to be accorded the expert's testimony and not its admissibility. *Id.*

Although neither party made reference to it, we note that authority exists to guide us on this precise question. In *Fox v. State*, 506 N.E. (2d) 1090, 1094 (Ind. 1987), the Indiana Supreme Court held that a detective was qualified as an expert in the field of blood spatter interpretation where he had "attended a school for approximately one to two weeks for the study of bloodstains and interpretation of blood spatterings," and where "he had never testified in a trial on the flight characteristics of blood or blood spattering." The court there stated, "(w)e recognize that Detective Weeks' expertise in this area was limited; however, we find no abuse of discretion in the trial court's ruling that his limited experience goes to the weight of his testimony rather than its admissibility." *Id.* We take the identical view in the instant case. Therefore, in the particular facts and circumstances of this case, we hold that it was error for the trial judge to refuse to qualify Ms. Koelpin as an expert.

We hold that the trial judge here applied the rules concerning the qualifying of an expert too stringently, and that his ruling impacted on the fairness of the Myers' trial. *See California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. (2d) 413 (1984) (the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense). The State's counsel at oral argument conceded that the interpretation of blood stains and spatters is a matter for expert opinion; a matter outside the knowledge of ordinary jurors. Thus, expert testimony was warranted.

Despite this, the question of blood spatters and their interpretation was discussed thoroughly by the Solicitor in his closing argument:

Now I want to show you a picture and you draw your own conclusions, but I'm gonna submit to you that Mr.

Myers was flat on his back on the floor when he was repeatedly bashed about the face. . . . I want you to particularly take note, Mr. Myers is lying flat on his back, just like they described they found him, his arm is in this position, but yet when they show you this blood, the officer testified that it was about five inches down in this area at the bottom of the wall on which there was no blood. The blood was from about five inches, if I recall his testimony, but you look at it. Tell me if you see any blood in this area. The blood is up at the top of the picture. You see lots of blood on his arm.

I submit to you that that man was lying there and was hit and that blood spurting from his head, that arm caught the low blood and it didn't go over on the floor. There's absolutely none that you see in this area here, and I think Lt. Knight it was, testified there might have been a few drops in there, but none to speak of.

If he was hit in any other condition than that, why wouldn't there be blood all around his head? Why wouldn't there be blood between him and the wall? Why wouldn't there be blood on the bottom of the wall?

Do you think that that man was ever hit standing up with any type of instrument? Do you think that that man was hit entirely as he leaned over somebody and was choking them. Look at his tee shirt. Where is the blood that would have fallen down if he had been standing up? Where is the blood on that tee shirt that would have been on there if he had been in any upright position, or a semi-upright position?

(Tr. 465, 11. 21-24; 466, 11. 3-22; 467, 11. 1-7). The jury was therefore presented only with the Solicitor's interpretation of the blood spatters, despite the State's concession that this blood spatter evidence is a matter for expert opinion.

The State argues that the appellants made no proffer regarding the substance of Ms. Koelpin's testimony, and for that reason, there was no error preserved for our review. We cannot agree. It is clear from the transcript that at least Ms. Koelpin was going to enlighten the jury, through her expertise, on general principles of blood spatter interpretation. The following testimony demonstrates this:

Q. What did you learn that week regarding blood?

A. Primarily what the characteristics of blood, if blood travels a certain distance and strikes a certain object, it would show differently than blood that would travel in another path. The path of the blood is very important. It will leave certain patterns. That's the easiest way really to explain it. You have splashed blood and it will look different than blood that has—

(Tr. 123, 11. 1-8). At this point, the trial court interrupted Ms. Koelpin and made the determination that she was not qualified as an expert.

Although we have no way of knowing whether Ms. Koelpin would have opined that the blood spatters indicated self-defense by Lucille and David, we can divine that at least Ms. Koelpin would have informed the jury of the principles of blood spatter evidence so that the jurors could make an intelligent decision interpreting the blood spatters. The jury was deprived of this expert information and was instead bombarded with the solicitor's nonexpert views and interpretations of the blood spatters. We hold that this was sufficiently prejudicial to make the trial court's ruling reversible.[1]

## C. *Comments on the Defendants' Post-Arrest Silence*

The appellants also assert that the trial court erred in permitting the Solicitor to comment on the defendants' post-arrest silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. (2d) 91 (1976). The Solicitor repeatedly drew attention to the fact that Lucille exercised her constitutional right to remain silent following her arrest for the murder of Winston. No objections were made, and therefore these errors were not preserved for our review.

---

[1] We emphasize that a proffer remains the proper procedure to preserve for review the issue of an expert witness' qualifications. However, it is clear from the record here that prejudice existed despite the absence of a proffer. The expert witness was competent to testify based on her credentials. The State concedes that the matter is one for expert testimony. The solicitor argued to the jury the significance of blood spatters as crucial evidence in the case. Depriving the jury of expert testimony regarding the blood spatters clearly hampered its ability to evaluate the facts before it in this case.

Further, the trial judge gave a curative instruction. However, we strongly caution solicitors against violating the *Doyle* prohibition, and we urge that such comments be avoided in the future.

In conclusion, we hold that the trial judge abused his discretion in refusing to qualify Ms. Koelpin as an expert in the field of interpretation of blood spatters, and, therefore, we reverse the appellants' convictions and remand their case for a new trial.

GREGORY, C.J., and HARWELL, CHANDLER and FINNEY, JJ., concur.