731 S.E.2d 338

**The STATE, Respondent,**

v.

**Kevin J. WILLIAMS, Appellant.**

**No. 5015.**

Court of Appeals of South Carolina.

Heard April 10, 2012.

Decided Aug. 1, 2012.

---

Wanda H. Carter, Deputy Chief Appellate Defender, South Carolina Commission on Indigent Defense, of Columbia, for Appellant.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, Assistant Deputy Attorney General David A. Spencer, all of Columbia; Solicitor I. McDuffie Stone, III, of Beaufort, for Respondent.

WILLIAMS, J.

Kevin Williams (Williams) appeals his convictions for voluntary manslaughter and possession of a weapon during the commission of a violent crime, arguing the circuit court erred in (1) allowing the State to comment on Williams' post-arrest silence in violation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); and (2) denying Williams' request to charge the jury on defense of habitation. We reverse and remand.

## FACTS

On the night of July 9, 2007, Williams was at home with his common-law wife of eighteen years, Valerie Young (Valerie); their two children, Kevin Jr. and Kelsey; and Valerie's eighteen-year-old son, Rodney. The following relevant testimony was elicited at trial regarding the events surrounding that evening.

Valerie testified she and Williams were arguing in their bedroom when their thirteen-year-old son, Kevin Jr., entered the room and inquired what was going on between them. She told Kevin Jr. everything was fine and to leave. Valerie stated Williams then hit her on the leg with a small curtain rod and pulled her hair, causing her to scream. At that point, Rodney came into the bedroom to try to stop the fight, and Valerie claimed Williams said, "I knew this day would come." Valerie testified Rodney told Williams, "Dad, my mom deserves to go out and have a good time, she don't (sic) deserve that," and then Rodney left the room. Williams retrieved his shotgun from underneath the bed and pulled some shotgun shells out of his top dresser drawer. After Williams left the bedroom, Valerie stated she heard a loud boom and ran

outside to find that Williams had shot Rodney in the leg. Rodney died later that evening from the gunshot wound.

Williams and Valerie's son, Kevin Jr., also testified. Describing the night in question, Kevin Jr. stated he went to his parents' bedroom because he heard his mother crying. When Kevin Jr. asked why they were fighting, his parents said everything was fine. Rodney then came into the room, and he and Williams began to argue. Kevin Jr. testified that Rodney left the house but that Rodney was coming back up the steps onto the porch when Williams shot him. Kevin Jr. further testified that Williams was standing in the doorway of the front door when he shot Rodney and that Rodney never tried to reenter the house before Williams shot him.

Williams testified in his own defense at trial. Williams, who had been the lead supervisor and shift operator at a chemical plant for twenty years, stated he worked a full shift on the day of the shooting. Williams claimed that on the night in question, he and Valerie were arguing about her failure to clean the master bedroom despite Valerie being off from work that day. Williams said as they were arguing, Valerie picked up a small curtain rod, but he snatched it from her. He then proceeded to "poke" her with it and hit her on her leg before throwing it on the ground. He claimed Valerie started yelling and cursing at him, at which time Kevin Jr. came into the bedroom and asked Williams if everything was all right. According to Williams, after he assured Kevin Jr. everything was okay, Kevin Jr. left, and Rodney came into their bedroom. Williams had his back turned away from the door, so Rodney was able to grab Williams behind the neck. Williams stated Rodney turned Williams around and tried to grab his neck again. Williams testified he slapped Rodney's hands down and said, "I know you're not going to put your hands on me," to which Rodney responded, "You're a dead mother f*cker.... You better get your damn gun."

Williams stated Rodney then ran out of the bedroom, through the living room, and out the front door, leaving the front door open behind him. Once Rodney ran out, Williams looked through the window blinds and saw headlights outside. Williams ran back to his bedroom, grabbed his shotgun, and ran into the living room where he heard Rodney on the porch.

Williams stated he told Rodney not to come into the house. Williams claimed Rodney's posture was very menacing, and he was telling Williams, "You're going to die tonight." Williams stated Rodney had one hand behind the back of his thigh, and he heard a clicking sound that convinced him Rodney was carrying a gun. Williams stated Rodney kept repeating that he was going to kill Williams, and because he knew Rodney had a gun behind his back, he shot him in the leg.

Williams left the house in his car but turned himself into police later that evening. Upon his arrest, he was advised of his *Miranda* rights and transported to the sheriff's department. At the sheriff's department, Williams met with Investigator John Kelleher (Investigator Kelleher).

At trial, Investigator Kelleher testified he also advised Williams of his *Miranda* rights and then asked Williams whether he wanted to talk. Williams responded that he did not want to talk. At this point during Investigator Kelleher's testimony, Williams objected, arguing the State could not comment on his post-arrest silence. The circuit court overruled this objection. Later during trial, the State made two additional comments on Williams' post-arrest silence, to which defense counsel failed to object.

After the close of evidence, the circuit court charged the jury on murder, the lesser-included offenses of voluntary and involuntary manslaughter, and self-defense. The circuit court also instructed the jury on possession of a weapon during the commission of a violent crime and on criminal domestic violence of a high and aggravated nature. The circuit court refused Williams' requested charge on defense of habitation. The jury found Williams guilty of voluntary manslaughter and possession of a weapon during the commission of a violent crime. He was sentenced to eighteen years on the manslaughter conviction to run concurrently with a five-year sentence on the weapons conviction. This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). This court is bound by the circuit court's factual findings unless they are clearly erroneous. *Id.* This court does not reevaluate the facts based on its own view of the

preponderance of the evidence but simply determines whether the circuit court's ruling is supported by any evidence. *State v. Moore*, 374 S.C. 468, 473–74, 649 S.E.2d 84, 86 (Ct.App. 2007).

## LAW/ANALYSIS

### *Doyle v. Ohio* violation

Williams claims the circuit court erred when it allowed the State to comment on his post-arrest silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). We agree.

In *Doyle v. Ohio*, the United States Supreme Court held the due process clause of the Fourteenth Amendment is violated when the State seeks to impeach a defendant's exculpatory story, told for the first time at the trial, by cross-examining him about his post-arrest silence after receiving *Miranda*[1] warnings. 426 U.S. at 611, 96 S.Ct. 2240. The rationale for *Doyle* is that it would be a violation of due process to allow the State to comment on the silence which *Miranda* warnings have encouraged. *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006).

In addressing why it was error in *Doyle* for the State to ask the defendant why he did not assert his innocence after his arrest by telling police his exculpatory story, the Supreme Court held:

> Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Doyle*, 426 U.S. at 617–18, 96 S.Ct. 2240.

█ A review of the record reveals the State improperly highlighted Williams' post-arrest silence on four occasions

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

during trial. Williams objected to the State's first two comments on Williams' post-arrest silence, but failed to object to the State's two subsequent comments. Despite Williams' failure to object to these subsequent instances, we review the entire record in determining whether the misconduct is sufficient to warrant reversal.[2] *See State v. Arther*, 290 S.C. 291, 296, 350 S.E.2d 187, 190 (1986) (holding a *Doyle* violation "does not require reversal of a conviction if a review of the *entire* record establishes that any error was harmless beyond a reasonable doubt") (emphasis added).

■ This court will not reverse Williams' conviction if the comments amounted to harmless error. For a *Doyle* violation to be harmless, the record must establish:

that the reference to silence be a single reference; that the single reference never be repeated or alluded to in either the trial or in jury argument; that the prosecutor does not directly tie the defendant's silence to his exculpatory story; that the exculpatory story be totally implausible[ ] [and] transparently frivolous; and that evidence of guilt be overwhelming.

*State v. Hill*, 360 S.C. 13, 17–18, 598 S.E.2d 732, 734 (Ct.App. 2004) (internal citation omitted).

■ On appeal, Williams specifically objects to the State's questioning of Investigator Kelleher, who spoke with Williams the night he was brought to the sheriff's department. When asked whether he had any conversations with Williams that night, Investigator Kelleher responded, "On that night at the Investigation Office I advised him of his *Miranda* rights. I

---

2. We are cognizant of *State v. Myers*, 301 S.C. 251, 391 S.E.2d 551 (1990), in which the supreme court implied the State improperly commented on the defendant's post-arrest silence in violation of *Doyle. Id.* at 258, 391 S.E.2d at 555. Although the supreme court in *Myers* acknowledged the State repeatedly and improperly drew attention to the defendant's right to remain silent, it found defense counsel's failure to raise an objection prevented appellate review. *Id.* at 258–59, 391 S.E.2d at 555. Moreover, it indicated the circuit court's curative instruction was sufficient to cure "these errors," but it strongly cautioned solicitors against violating the *Doyle* prohibition and urged such comments to be avoided in the future. *Id.* at 259, 391 S.E.2d at 555. We find *Myers* distinguishable from the instant case because Williams objected on two separate occasions, and the circuit court failed to issue a curative instruction.

asked him if he wants to tell me what happened and he stated he doesn't want to talk." Williams immediately objected, arguing Williams' decision to invoke his right to remain silent was inadmissible.

In addition, prior to Investigator Kelleher's testimony, Williams objected to the State's questioning of Corporal Keith Gregg (Corporal Gregg), who was on call the evening of the incident. The State asked Corporal Gregg whether he spoke to Williams when he was arrested. Corporal Gregg stated he read Williams his *Miranda* rights. When questioned about this exchange, Corporal Gregg testified Williams understood his rights and was very calm and compliant. Corporal Gregg stated he told Williams he was being arrested for murder. The State then asked Corporal Gregg, "Well did he tell you that he someone (sic) had tried to kill him that night?" Corporal Gregg stated, "No," to which Williams immediately objected.

The third comment on Williams' post-arrest silence occurred during Williams' testimony. The State asked Williams on cross-examination why he never told Investigator Kelleher that Rodney pulled a gun on him. The State followed up saying, "Twelve hours later, after you slept on it you told them [Rodney pulled a gun on you]." In response, Williams stated, "No, I didn't answer [Investigator Kelleher's] questions. He read me my rights. I didn't say anything. What he did, [ ] twelve hours later was serve me another warrant and that's when I spoke to him." The State proceeded, "You didn't tell anybody when they tell you you're charged with murder, you don't tell anybody, well, he had a gun." Williams replied, "Yes, I did. . . . I did tell them," to which the State replied, "After you had some time to think about it. That's when you come up with the gun story; isn't that true?" Defense counsel did not object to this colloquy between the State and Williams.

The last improper comment on Williams' post-arrest silence occurred during closing arguments. In the State's attempt to disprove Williams' claim of self-defense, the State argued Williams fabricated the story about Rodney being armed with a gun. The State posed the question to the jury, "Or [was] . . . [Rodney being armed with a gun] another figment of his

imagination that [Williams] came up with during the twelve hours he waited to talk to law enforcement?" Williams did not object.

Reviewing the entire record, as we must, we find the cumulative effect of the State's comments to be prejudicial error. *See Arther*, 290 S.C. at 296, 350 S.E.2d at 190 (holding a *Doyle* violation "does not require reversal of a conviction if a review of the *entire* record establishes that any error was harmless beyond a reasonable doubt") (emphasis added). On at least four occasions during trial, the State highlighted Williams' silence during the first night of his custody, and Williams immediately objected to the State's tactics on two of these occasions. We find the State's comments to be prejudicial because the State attempted to show that if Williams acted in self-defense, he would have immediately explained this to the police. *See Brown v. State*, 375 S.C. 464, 473, 652 S.E.2d 765, 770 (Ct.App.2007) ("The State cannot, through evidence or the solicitor's argument, comment on the accused's exercise of his right to remain silent."). Because the State directly tied Williams' silence to his claim of self-defense, the error cannot be harmless. *See Hill*, 360 S.C. at 18, 598 S.E.2d at 734 (reversing conviction for violation of defendant's due process rights and holding "[i]n essence, the prosecution attempted to show had [the defendant] acted in self-defense he would have immediately explained this to authorities. Because the State directly tied [the defendant's] silence to his defense, the error cannot be harmless"). Accordingly, we reverse on this ground.[3]

## CONCLUSION

Based on the foregoing, we **REVERSE** Williams' conviction and **REMAND** for a new trial.

**REVERSED and REMANDED.**

THOMAS and LOCKEMY, JJ., concur.

---

3. Our decision to reverse on this issue disposes of Williams' remaining argument on appeal. Therefore, we decline to address Williams' remaining argument. *See Futch v. McAllister Towing, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999)