# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Deshanndon Markelle Franks, Appellant.

Appellate Case No. 2016-002244

Appeal From Laurens County
Frank R. Addy, Jr., Circuit Court Judge

Opinion No. 5758
Heard October 22, 2019 – Filed August 12, 2020

**AFFIRMED**

Chief Appellate Defender Robert Michael Dudek, for
Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Senior Assistant Attorney General W. Edgar Salter, III,
all of Columbia; and Solicitor David Matthew Stumbo, of
Greenwood, for Respondent.

**LOCKEMY, C.J.:** On January 31, 2014, Atrayel Williams called 911 after she
discovered the bodies of Nikesha James and Sammie Darryl Leake in the living
room of James's mobile home. James had been shot in the chest, and Leake had
been shot in the head and neck. Police later identified Deshanndon Markelle

Franks as a suspect, and he was indicted for and convicted of the murders of James and Leake.

Franks appeals his convictions and sentence of forty-five years' imprisonment for two counts of murder and possession of a weapon during the commission of a violent crime, arguing the trial court erred by (1) qualifying the State's witness as an expert and (2) instructing the jury it could infer malice from the use of a deadly weapon. We conclude the trial court did not abuse its discretion in qualifying the State's witness as an expert, and any error in the court's jury charge was harmless beyond a reasonable doubt. For these reasons, we affirm Franks's convictions.

**FACTS**

At the outset of his jury trial, Franks moved to suppress his Verizon Wireless cell phone records, which contained cell site location information (CSLI), arguing they were the product of a warrantless search.[1] The trial court denied Franks's motions.

Laquesha Currenton, Leake's cousin and a close friend of James's,[2] testified she last spoke to James around 11:00 p.m. or 12:00 a.m. on January 30. Williams, another of James's close friends, testified she last spoke to James around 9:00 p.m. on the 30th and could not reach her when she called around 10:30 a.m. the next morning. That afternoon, Williams and Currenton drove to James's home in Cross Hill, where they found the bodies of James and Leake, and Williams called 911.

Lavashtia Pulley testified she saw Franks and a man named Tevin Hill (Tevin) at a liquor house called "Wash" earlier on the evening of January 30. She recalled she spoke to Franks around 11:00 p.m. and he seemed "hyped" and "pumped, amped, whatever." Pulley testified she had "never seen him like that" before. She explained that while they were talking, Franks pulled out a few things from his coat, including a gun, which he said was "a Ruger." She described the gun as "black ashy kind of like." Pulley stated Franks wore a tan "overall suit," "[l]ike a hunting suit," that night. At trial, she identified a State's exhibit as the overalls she saw him wearing. Pulley stated she did not speak to Tevin or see him together

---

[1] Franks also moved to suppress a digital photograph obtained from his cell phone, a pair of brown overalls and an extended magazine found during a search of his home, and his written statement to law enforcement.

[2] Currenton noted that although others sometimes referred to Leake as James's uncle, they were not actually related.

with Franks. Pulley recalled she received a text message from Franks the next morning, but he did not mention the deaths of James or Leake.

Tamia Kinard, another friend of James's, testified she, her aunt, and her baby went to James's house around 8:00 p.m. on January 30, and Leake arrived sometime thereafter. Kinard explained her aunt left later in the evening, and Franks and Tevin came over to James's sometime afterwards. She estimated they arrived around 12:15 a.m. Kinard testified Franks had on a brown overall jumpsuit "like a hunting suit" that night and some type of red sweater over the jumpsuit. She recalled that when Franks arrived, he asked James "about something that she put on Facebook" and "asked her to come back in the bedroom to talk [to] him." Kinard stated they went into the bedroom and "had a discussion." She estimated they were in the bedroom for about ten or fifteen minutes and when they came out, "[t]hey w[ere] laughing and talking normal, like it wasn't a problem."

Around 1:00 a.m., Kinard asked Tevin to drive her home "because [Franks] was being loud" and her baby was asleep. When asked how Franks behaved that night, Kinard stated he was "hyper[, l]ike amp, you could say. He was just wild. Like he was talking loud[, h]e was jumping around like. He just wasn't acting normal." She stated that when she and Tevin left, Franks, James, and Leake were still present at James's home.

Kinard explained Tevin's route took them behind her uncle's, Milton Grant's, mobile home. Grant testified he lived about three houses down from James on John Grant Street. Grant recalled that that around 1:00 a.m., he was awakened by headlights shining through his bedroom window. He stated he could not fall back asleep, and around 3:00 a.m., he heard gunshots that sounded like they came from very close. Grant testified he jumped up and went to the window and saw someone come out of James's front door. He saw the person walk down the front steps, walk back up, turn the porch light off, close the door, and then continue walking up and down the steps before eventually disappearing. Grant stated the person "had something brown on."

Tevin testified that in January 2014, he lived at his grandmother's house on John Grant Street in Cross Hill. He stated that on the night of January 30, he met up with Franks around 8:00 p.m., and they went to "a liquor house" called "the Wash" or "Washes," where they stayed for about three hours. He remembered seeing Pulley there, and he assumed she and Franks talked because he saw them walk outside together. Tevin testified Franks was wearing brown overalls that night and identified a State's exhibit as the same overalls he saw Franks wearing. He stated that around midnight he and Franks left and went to James's, which was "where

everybody used to hangout." Tevin recalled that when they arrived, Franks was acting "kind of like loud. Kind of amp like." Tevin testified James, Leake, Kinard, and Kinard's baby were at James's when they arrived. He recalled Franks and James "went to the back of the house" to talk that night but he could not hear their discussion.

Tevin stated he drove Kinard home a short while later and Franks, James, and Leake all stayed behind. Tevin recalled he drove past Grant's home with his bright headlights on, which shined on Grant's home. He stated he arrived home around 2:00 or 3:00 a.m. after dropping Kinard off and sometime after that, Franks called and told him to come outside. Tevin explained he went outside and saw Franks walking up the road, away from James's house. Tevin stated Franks was "shaky" and "not normal" and said "stuff went bad." He testified Franks then asked him for a ride, stating he "had some females up the road like in Greenville" but once they neared Fountain Inn, Franks told Tevin to drive him to Rodrigus Scurry's house. Tevin testified they stayed at Scurry's until about 8:00 a.m. and then went back to Cross Hill. He recalled that during the car ride back, Franks said "we got to get the guns out the house or something," but Tevin did not know what he was talking about. Tevin stated he went home after dropping Franks off at his grandmother's home and a short time later, he heard police arrive at James's house. He received a call from his cousin, Deputy Rakeisha Hill, who asked him to come to the scene and bring Franks. He explained Franks "act[ed] like he didn't want to go" and then told Tevin what to tell the police. Tevin testified Franks told him to say Franks got in the car after he dropped Kinard off and then they drove to Greenville. Tevin explained he wrote this in his first statement to police, but it was a lie. He denied seeing Franks with a gun that night but stated he had seen him with a gun before that looked like the gun in the photo on Franks's phone. Tevin acknowledged he was also charged with murder and the State agreed to drop the murder charges if he cooperated in the disposition of Franks's case.

Scurry testified Franks called him around 3:00 a.m. on January 31 and said he was on his way home from Greenville but could not make it home because he had been drinking. He stated Franks called again around 4:00 a.m. when he and Tevin arrived. Scurry testified he showed them where to sleep and went back to bed. He stated Franks contacted him the next day and asked if he had talked to the police.

Officer Bryant Cheek testified he responded to the scene on January 31. He noted he encountered Tevin, who was nearby, on his way to the scene. Officer Cheek explained he recognized Tevin from coaching basketball and spoke to him briefly before proceeding to the scene. Upon arriving at the scene, Officer Cheek

interviewed bystanders who had gathered there. He stated Franks was asked to come to the scene after law enforcement learned he was at James's home the night of the shooting. Officer Cheek questioned Franks and took his statement. The trial court admitted the statement into evidence over Franks's objection. Franks stated he was at James's the night before with Kinard, Tevin, James, and Leake. Franks stated that after Tevin left to take Kinard home, he stayed and talked to James and Leake until he called Tevin. According to Franks, Tevin then picked him up "at the top of the driveway" and they drove to Greenville. Franks stated he "[c]alled a girl he was going to see" but when she did not answer, he called Scurry and spent the night at Scurry's in Fountain Inn.

Franks and Tevin turned over their phones to law enforcement, who obtained search warrants to extract the data from the phones. A digital photo of a handgun was retrieved from Franks's phone. Law enforcement also obtained Franks's cell phone records from Verizon Wireless and searched his grandmother's home, where they found a pair of brown overalls, a backpack, and an elongated magazine for a firearm. The trial court admitted this evidence over Franks's renewed objections.

A crime scene investigator with the South Carolina Law Enforcement Division (SLED) testified she observed indications that a struggle had occurred in the home, including a rug that was folded over on itself, coffee mugs and picture frames on floor, and couch cushions that were off the couch. Officers swabbed several surfaces for DNA and collected projectiles, fragments of projectiles, a drug pipe, and cartridge casings from the scene. Two of these cartridge casings were admitted into evidence, but no firearms were found. SLED analysts tested the DNA evidence collected at the scene but were unable to identify any DNA profiles other than those matching the victims' DNA. Franks's overalls were tested for gunshot residue, but none was found.

The forensic pathologist who conducted the victims' autopsies explained James suffered a gunshot to the chest, angled downward sharply, and Leake suffered gunshots to the head and neck, both angled upwards. He determined homicide to be the manner of death as to both victims because the wounds could not have been self-inflicted. The forensic pathologist recovered a projectile from James's back and discovered a deformed projectile loose in Leake's clothing as well as some fragments in the body bag.

Ira Parnell, formerly of SLED, testified as an expert in firearm and tool mark identification. Parnell examined the projectiles recovered from James's body and Leake's clothing, as well as two fired projectiles collected from the scene. He

opined all four fired bullets were fired by the same firearm and were 9 millimeter Ruger caliber bullets. Parnell testified Ruger was one of about eighty possible manufacturers that might have made a weapon that could have fired those bullets. He identified the magazine recovered from Franks's backpack as an "extended high capacity magazine which appeared to be consistent with a 9 millimeter caliber" and opined it would "very possibly" be compatible with a Ruger 9 millimeter. Parnell also concluded the handgun in the digital photo retrieved from Franks's phone appeared to be a 9 millimeter Ruger.

Sergeant Dan Kelley, of the Greenville County Sheriff's Office, testified he had twenty-seven years of law enforcement experience. He explained he reviewed phone records as part of his job. Sergeant Kelley testified that when his office received phone records, the data was in "huge voluminous amount[s]" and took "weeks [or] months to sort through." He stated his office began using a software called GeoTime to "help speed things up." Sergeant Kelley testified GeoTime worked in conjunction with another program called a "call records tool" to sort the data into an easy-to-see format. He stated he had worked with cell phone technology and records for about fifteen years, with GeoTime for three to four years, and had used GeoTime in about fifty cases. Additionally, he stated he watched several of GeoTime's seminars. The State offered Sergeant Kelley as "an expert witness in the use of GeoTime software and call records translation tools."

During voir dire, Franks questioned Sergeant Kelley about the GeoTime software. He testified it was a PC-based software but was uncertain if it was "certified" by Microsoft; however, he noted he most commonly received cell phone records in Excel format. In describing how GeoTime functioned, Sergeant Kelley explained, "It's a basic function that when you bring the data in[,] it sorts it so that you can see it." He stated GeoTime was "widely used" in the law enforcement field and was "rapidly [becoming] the industry standard." In questioning Sergeant Kelley, Franks stated, "I will assume you're very good at the use of GeoTime. But . . . are you able to testify as to the algorithms, the functioning, how it works as far as the reliability of the software?" Sergeant Kelley stated he could testify regarding the use of the software and the data it translated but not the algorithms it used. When questioned whether he had done any testing to "manually calculate and verify GeoTime data," he explained the data in phone records included latitude and longitude coordinates and he had used the wireless provider's mapping system,

"Esri's" mapping system,[3] and Google "to see where the points would line up with the data . . . and the points were accurate." Sergeant Kelley explained he performed this "cross-checking" on "just about every case," and in this case, he used Google to verify the points were the same. He stated GeoTime consolidated the information received from the phone company to show only the necessary data, which it placed into a visual format. Sergeant Kelley explained the records normally included the latitude and longitude of each call, the caller number, the calling party's number, text numbers, and phone numbers. He testified the data he relied on was billing data that contained location data as to "where the handset [wa]s at the time the call was made." Sergeant Kelley stated this "real time transmission" data was also referred to as "ping" data and it refers to the signal that goes out from a handset at the time a phone call is initiated, "hits the tower," and is received back to the handset. He stated this "ping" showed the phone company's "best estimate" of where the handset was at the time it communicated with the tower. Although he averred that the billing data was "very accurate," he acknowledged the precise accuracy of the towers and data was "for an expert from Verizon to testify to."

Franks objected, arguing the data contained in the Verizon records was unreliable. He stated, "[M]y argument is not so much with GeoTime. It is with the data [that is fed] into GeoTime." Franks argued that if no expert from Verizon testified as to the accuracy of the data, there was no way to determine its reliability.

The trial court noted the records were already in evidence and explained that its gatekeeping function in a Rule 702, SCRE, reliability analysis was to determine whether the methodology, in this case, GeoTime, was a reliable and trusted method of obtaining relevant data or information. However, the court found Franks's objection concerned "the data provided from the phone company," which was "completely separate" and the court noted Franks only objected to the admission of the underlying data on search warrant grounds and not reliability grounds. The trial court noted Franks did not contest the underlying reliability of GeoTime, and it then allowed Sergeant Kelley to testify as an expert in the use of GeoTime and other call record translation tools.

Sergeant Kelley testified that when he received Franks's call records data from Verizon, he placed the data into the call records translation tool along with the "cell

_____

[3] Sergeant Kelley stated Esri was "the recognized industry leader." Esri is a company that builds geographic information system (GIS) mapping and analytics software.

tower file," which showed all of the cell towers that "were in play" when the phone was used and thus provided "geolocation" information for the cellphone.  He explained that the information was merged in the call records translation tool, the phone call data was matched with the cell tower data, and entered into GeoTime.  He stated GeoTime then plotted the exact points from the data onto a map in date and time order and created a visualization showing where the handset was "in relation to space and time."  These visualizations were admitted into evidence without objection.  Sergeant Kelley testified these showed three calls made at different times, all in different locations, and nothing in that information indicated the handset was ever in Greenville during that time.  He stated that on January 31, 2014, the information placed the handset on John Grant Street in Cross Hill at 2:53:52 a.m., again in the Cross Hill area at 3:06 a.m., and in Fountain Inn at 4:04:43 a.m.  On cross-examination, Sergeant Kelley acknowledged he could not state the accuracy of the pinpoint down to the foot, and it was only Verizon's best estimate of where the handset was at the time.

The State rested, and Franks renewed all prior motions and objections, which the trial court denied.  The State then delivered its closing argument, and before Franks made his closing argument, the trial court held an off-the-record sidebar discussion with counsel.  Thereafter, the trial court informed the parties it intended to add the "inference of malice language from the use of a deadly weapon" to its jury instruction concerning malice.  The trial court reasoned that under its reading of *Belcher*,[4] the instruction "would be appropriate in this case" because no evidence was presented that tended to reduce the homicide from murder to voluntary or involuntary homicide.  The court noted, "I do understand [Franks's] objection to that that he made at sidebar.  Despite that objection, the [c]ourt has included that language."  Franks then proceeded with his closing argument, and the trial court charged the jury.  The court's instruction included the following:

> [T]he [d]efendant is charged with two counts of murder.
> The State must prove beyond a reasonable doubt that the
> [d]efendant killed another person with malice
> aforethought.  If facts are proven beyond a reasonable
> doubt sufficient to raise an inference of malice and to
> your satisfaction, this inference would simply be an
> evidentiary fact to be considered by you along with the

[4] *State v. Belcher*, 385 S.C. 597, 612, 685 S.E.2d 802, 810 (2009), *overruled in part by State v. Burdette*, 427 S.C. 490, 504-05, 832 S.E.2d 575, 583 (2019).

other evidence in this case and you may give it the weight you think it should receive.

I instruct you . . . that malice is defined as hatred, ill-will or hostility toward another person. It[ i]s the intentional doing of a wrongful act without just cause or excuse, and with an intent to inflict injury, or under circumstances the law will infer an evil intent. Malice aforethought does not require that malice exists for any particular time before the act is committed, but malice must exist in the mind of the [d]efendant just before and at the time the act is committed. Therefore, there must be a combination of the previous evil intent and the act.

I instruct you that malice aforethought may be express or inferred. These terms expressed and inferred do not mean different kinds of malice, but merely the manner by which malice may be shown to exist. That[ i]s either by direct evidence or by inference from the facts and circumstances—circumstances which are proven. Expressed malice is shown when a person speaks words which express hatred or ill-will to another person, or when the person prepare [sic] beforehand to do the act that was later accomplished. For example, laying in w[ai]t for a person or any other acts in preparation going to show that the deed was within the [d]efendant's mind with the expressed malice.

Malice may also be inferred from conduct showing a total disregard for human life. Inferred malice may also arise when the deed is done with a deadly weapon. . . . The following are examples of instruments . . . which may be deadly weapons[:] . . . [a] pistol, shotgun, [or] rifle.

Thereafter, Franks again noted his "objection to the malice." The trial court adhered to its earlier ruling. After about seven hours of deliberation over the course of two days, the jury found Franks guilty of both murders and the weapons charge. The trial court sentenced him to concurrent terms of forty-five years'

imprisonment for each of the murder charges and five years' imprisonment on the weapons charge.  This appeal followed.

## ISSUES ON APPEAL

1.  Did the trial court abuse its discretion by qualifying Sergeant Kelley as an expert pursuant to Rule 702, SCRE, to testify regarding location data associated with Franks's cell phone?

2.  Did the trial court err by instructing the jury "inferred malice may arise when the deed is done with a deadly weapon"?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only."  *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006).  "This [c]ourt is bound by the trial court's factual findings unless they are clearly erroneous."  *Id.*

## LAW/ANALYSIS

## I.     Expert Witness

Franks argues the trial court abused its discretion by allowing Sergeant Kelley to testify as an expert witness because it failed to determine he was qualified in the particular area or that the testimony was reliable.  Franks contends that pursuant to *State v. White*,[5] *Watson v. Ford Motor Co.*,[6] and *State v. Council*,[7] the CSLI evidence and opinion testimony was inadmissible through Sergeant Kelley because the underlying evidence was unreliable.  He asserts the testimony prejudiced him

---

[5] 382 S.C. 265, 274, 676 S.E.2d 684, 689 (2009) (holding trial courts have a gatekeeping role pursuant to Rule 702, SCRE, and the court must assess the threshold foundational requirements of qualifications and reliability before admitting expert testimony).
[6] 389 S.C. 434, 446-47 699 S.E.2d 169, 175 (2010) ("[O]nly after the trial court has found that expert testimony is necessary . . . , the expert is qualified in the particular area, and the testimony is reliable, may the trial court admit the evidence and permit the jury to assign it such weight as it deems appropriate.").
[7] 335 S.C. 1, 19, 515 S.E.2d 508, 517 (1999) (setting forth four factors the trial court should consider in admitting scientific evidence under Rule 702, SCRE).

because it allowed the State to argue the records corroborated Tevin's "otherwise questionable testimony." We disagree.

"The qualification of an expert witness and the admissibility of the expert's testimony are matters within the trial court's sound discretion." *State v. Chavis*, 412 S.C. 101, 106, 771 S.E.2d 336, 338 (2015). We will not reverse the trial court's decision to admit expert testimony "absent a prejudicial abuse of discretion." *White*, 382 S.C. at 269, 676 S.E.2d at 686. "An abuse of discretion occurs when the conclusions of the circuit court are either controlled by an error of law or are based on unsupported factual conclusions." *Chavis*, 412 S.C. at 106, 771 S.E.2d at 338. "Prejudice occurs when there is reasonable probability the wrongly admitted evidence influenced the jury's verdict." *State v. Byers*, 392 S.C. 438, 444, 710 S.E.2d 55, 58 (2011).

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, SCRE. As part of its gatekeeping duties pursuant to Rule 702, "the trial court must find that the proffered expert has indeed acquired the requisite knowledge and skill to qualify as an expert in the particular subject matter." *Watson*, 389 S.C. at 446, 699 S.E.2d at 175. The trial court must then "evaluate the substance of the testimony and determine whether it is reliable." *Id.* "Reliability is a central feature of Rule 702 admissibility . . . ." *White*, 382 S.C. at 270, 676 S.E.2d at 686.

> [Our supreme court has] listed several factors that the trial court should consider when determining whether scientific expert evidence is reliable:
>
> (1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures.

*Watson*, 389 S.C. at 449-50, 699 S.E.2d at 177 (footnote omitted) (quoting *Council*, 335 S.C. at 17, 515 S.E.2d at 517); *see also id.* at 450 n.3, 699 S.E.2d at 177 n.3 (noting "[t]he test for reliability [of] expert testimony does not lend itself to a one-size-fits-all approach" but reasoning that when an expert's testimony was

based on "scientific principles and theories," the *Council* factors were "applicable and relevant to the reliability determination").

> Courts are often presented with challenges on both fronts[: ]qualifications and reliability. The party offering [an] expert must establish that his witness has the necessary qualifications in terms of "knowledge, skill, experience, training or education." Rule 702, SCRE. With respect to *qualifications*, a witness may satisfy the Rule 702 threshold yet the opponent may still challenge the amount or quality of the qualifications. It is in this latter context that the trial court properly concludes that "defects in the amount and quality of education or experience go to the weight to be accorded the expert's testimony and not its admissibility." *State v. Myers*, 301 S.C. 251, 256, 391 S.E.2d 551, 554 (1990). Turning to the reliability factor, a trial court may ultimately take the same approach, *but only after making a threshold determination for purposes of admissibility*.

*White*, 382 S.C. at 273-74, 676 S.E.2d at 688 (emphases added).

"To be competent to testify as an expert, 'a witness must have acquired by reason of study or experience or both such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony.'" *Gooding*, 326 S.C. at 252-53, 487 S.E.2d at 598 (quoting *O'Tuel v. Villani*, 318 S.C. 24, 28, 455 S.E.2d 698, 701 (Ct. App. 1995), *overruled on other grounds by I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 526 S.E.2d 716 (2000)); *see also Fields*, 376 S.C. at 555, 658 S.E.2d at 85 ("A person may be qualified as an expert based upon 'knowledge, skill, experience, training, or education.'" (quoting Rule 702, SCRE)). "The test for qualification of an expert is a relative one that is dependent on the particular witness's reference to the subject." *Maybank*, 416 S.C. at 567, 787 S.E.2d at 511 (quoting *Wilson v. Rivers*, 357 S.C. 447, 452, 593 S.E.2d 603, 605 (2004)).

We conclude the trial court did not abuse its discretion in finding Sergeant Kelley was qualified to testify as an expert in the use of GeoTime and other call records translation tools. First, the evidence shows he was qualified to testify about the applicable subject matter: GeoTime and call records translations. Sergeant Kelley testified he had fifteen years' experience working with call records and cell phone

technology, observed several seminars about GeoTime, and used GeoTime in approximately fifty cases over the course of three or four years. This testimony supports the trial court's conclusion that Sergeant Kelley had the relevant experience, training, and skill to testify concerning GeoTime and other call records translation tools. *See Fields*, 376 S.C. at 555, 658 S.E.2d at 85 ("A person may be qualified as an expert based upon 'knowledge, skill, experience, training, or education.'" (quoting Rule 702, SCRE)).

Second, we find the trial court did not abuse its discretion in finding the substance of his testimony reliable over Franks's objection to the reliability of the underlying data. Here, Franks's argument at trial and on appeal concerns the reliability not of GeoTime, but of the underlying data. However, he did not object to the data on this basis during the suppression hearing or at the time the Verizon call records were introduced into evidence. Rather, his only objection to the records was based on his argument they were unlawfully obtained without a warrant, a ruling he does not challenge on appeal. Because the underlying data—the Verizon records—had already been admitted into evidence when the State offered Sergeant Kelley as an expert, Franks waived his challenge to the reliability of the data by failing to object at the time the State introduced the data. *See State v. Simpson*, 325 S.C. 37, 42, 479 S.E.2d 57, 60 (1996) ("Unless an objection is made at the time the evidence is offered and a final ruling made, the issue is not preserved for review."); *State v. Prioleau*, 345 S.C. 404, 411, 548 S.E.2d 213, 216 (2001) ("[T]o preserve for review an alleged error in admitting evidence an objection should be sufficiently specific to bring into focus the precise nature of the alleged error so it can be reasonably understood by the trial judge."); *id.* ("Furthermore, a party may not argue one ground at trial and an alternate ground on appeal."). Therefore, we find Franks's objection to the reliability of the underlying data is unpreserved.

Even assuming the issue is preserved, the trial court did not abuse its discretion by finding the substance of the testimony was reliable. Sergeant Kelley explained the records normally included the latitude and longitude of each call, the caller number, the calling party's number, text numbers, and phone numbers. Although he could not testify to the precise accuracy of the location data down to the foot, he testified it was Verizon's best estimate of where the handset was at the time. Sergeant Kelley testified about his use of the GeoTime software to sort the information contained within the Verizon records, which included CSLI, and then display that information in a map format. We find the foregoing supports the trial court's finding the substance of the testimony was sufficiently reliable.

Further, as to any objection to the reliability of CSLI methodology, we find no error in the trial court's decision to admit the testimony. In reaching this conclusion, we emphasize this court recently "join[ed] the many other jurisdictions that have deemed CSLI reliable enough to pass the Rule 702 gate." *State v. Warner*, 430 S.C. 76, 89, 842 S.E.2d 361, 367 (Ct. App. 2020), *petition for cert. filed*, No. 2020-000930 (S.C. Sup. Ct. July 20, 2020). Here, Sergeant Kelley described the general science of geolocation based on CSLI. He explained that at the time a phone call is initiated, the cellular signal from the handset "hits the tower" is received back to the handset and then demonstrates the wireless provider's best estimate as to where the handset was at the time it communicated with the tower. Based on the foregoing, we find the trial court did not err by finding Sergeant Kelley's testimony concerning CSLI evidence and methodology was reliable. We therefore find the trial court did not abuse its discretion by admitting Sergeant Kelley's expert testimony.[8]

## II. Jury Instruction

Franks argues the trial court erred by instructing the jury it could infer malice from the use of a deadly weapon because evidence was presented that would reduce, mitigate, excuse, or justify the homicide. He asserts the instruction could not have been harmless because the State presented no evidence of motive, the evidence as to the identity of the shooter was purely circumstantial, and the jury deliberated for two days before reaching a verdict. In addition, he contends the record contained evidence that a third party was the shooter. We agree but find the error was harmless.

The State first argues Franks failed to preserve this issue for appellate review. It next argues that pursuant to *Belcher*,[9] the instruction was not erroneous because no

---

[8] We need not reach the issue of prejudice because we have found no error. Nevertheless, we question whether Sergeant Kelley's testimony prejudiced Franks because it showed where he *was not* as opposed to where he was. In other words, it was not used to place him at the crime scene but to show he never travelled to Greenville after he left James's residence. Further, it was cumulative to Tevin's testimony that he drove Franks to Fountain Inn and not to Greenville. *See State v. Johnson*, 298 S.C. 496, 499, 381 S.E.2d 732, 733 (1989) ("The admission of improper evidence is harmless whe[n] it is merely cumulative to other evidence.").
[9] 385 S.C. at 612, 685 S.E.2d at 810 (holding "whe[n] evidence is presented that would reduce, mitigate, excuse or justify a homicide . . . caused by the use of a deadly weapon, juries shall not be charged that malice may be inferred from the

evidence was presented that would "'reduce, mitigate, excuse, or justify a homicide' committed by use of a deadly weapon."

Recently, in *Burdette,* our supreme court extended *Belcher* and held, "*Regardless of the evidence presented at trial,* trial courts shall not instruct a jury that the element of malice may be inferred when the deed is done with a deadly weapon." 427 S.C. at 504-05, 832 S.E.2d at 583 (emphasis added).  The court explained,

> When the trial court tells the jury it may use evidence of the use of a deadly weapon to establish the existence of malice, a critical element of the charge of murder, the trial court has directly commented upon facts in evidence, elevated those facts, and emphasized them to the jury.

*Id.* at 502, 832 S.E.2d at 582.  Thus, the court concluded an "instruction that malice may be inferred from the use of a deadly weapon is an improper court-sponsored emphasis of a fact in evidence—that the deed was done with a deadly weapon— and it should no longer be permitted."  *Id.* at 503, 832 S.E.2d at 582.  The court stated this ruling was to be effective in those cases pending on direct review "so long as the issue is preserved."  *Id.* at 505, 832 S.E.2d at 583.

To preserve an issue for appellate review, "[t]he issue must have been (1) raised to and ruled upon by the trial court, (2) raised by the appellant, (3) raised in a timely manner, and (4) raised to the trial court with sufficient specificity."  *S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 301-02, 641 S.E.2d 903, 907 (2007) (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 57 (2d ed. 2002)).  "An objection made during an off-the-record conference which is not made part of the record does not preserve the question for review."  *York v. Conway Ford, Inc.*, 325 S.C. 170, 173, 480 S.E.2d 726, 728 (1997).  "Generally, this [c]ourt will not consider issues not raised to or ruled upon by the trial [court]."  *State v. Williams*, 303 S.C. 410, 411, 401 S.E.2d 168, 169 (1991).  Exact phrasing of the relevant legal doctrine is not necessary to preserve an issue when "it is clear from the argument presented in the record that the motion was made on this ground."  *State v. Russell*, 345 S.C. 128, 132, 546 S.E.2d 202, 204 (Ct. App. 2001).

---

use of a deadly weapon" and clarifying "[t]he permissive inference charge concerning the use of a deadly weapon remains a correct statement of the law whe[n] the only issue presented to the jury is whether the defendant has committed murder"), *overruled in part by Burdette*, 427 S.C. at 504-05, 832 S.E.2d at 583.

The *Burdette* opinion was not filed until after the parties here filed their briefs.  In advance of oral argument, this court requested the parties file memoranda addressing its impact on this appeal.  Franks argued that pursuant to the holding in *Burdette*, the instruction was erroneous regardless of whether there was any evidence to reduce, mitigate, excuse, or justify the homicide.  The State reiterated its preservation argument and argued any error was harmless.  We find Franks preserved the issue for appellate review.  Franks objected during an off-the-record sidebar after which the trial court acknowledged his objection but stated it would include the inference of malice language in its charge.  The trial court referenced *Belcher* and reasoned the inference of malice instruction was appropriate "because there[ wa]s no evidence tending to reduce the homicide to a voluntary or an involuntary homicide."  After the trial court charged the jury, Franks renewed his objection "to the malice," which the court again overruled, referencing its earlier ruling.  The State acknowledged Franks objected to the inferred malice instruction "for the reasons . . . [he gave] at the unrecorded sidebar."  We find Franks timely objected and the trial court ruled on the objection.  Although Franks did not place his specific grounds for objection on the record, we can infer from the trial court's ruling that Franks argued that pursuant to *Belcher* an inferred malice charge was improper when evidence is presented that would tend to reduce, mitigate, justify, or excuse the homicide.  This is the same argument Franks raised on appeal.  Further, we acknowledge the record does not show Franks argued that the charge would be inappropriate regardless of the evidence.  However, because we find Franks objected to the instruction based on *Belcher*, and *Burdette* subsequently extended *Belcher*, we find it was sufficient that Franks objected to the malice instruction and the court ruled on the objection.  *See Johnson v. Roberts*, 422 S.C. 406, 412, 812 S.E.2d 207, 210 (Ct. App. 2018) ("It cannot be said that [the a]ppellant's arguments are clearly preserved.  But in light of the foregoing, it also cannot be said that Johnson's arguments are clearly unpreserved.  In these situations, 'whe[n] the question of issue preservation is subject to multiple interpretations, any doubt should be resolved in favor of preservation.'" (quoting *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 333, 730 S.E.2d, 282, 287 (2012) (Toal, C.J., concurring in part and dissenting in part))), *aff'd*, 427 S.C. 258, 830 S.E.2d 910 (2019).  We therefore reach the merits of Franks's argument.

Pursuant to *Burdette*, we find the trial court erred by instructing the jury that it could infer malice from the use of a deadly weapon.  *See Burdette*, 427 S.C. at 504-05, 832 S.E.2d at 583.  Nevertheless, under the circumstances of this case, we find the error was harmless beyond a reasonable doubt.

"[E]rroneous jury instructions[] are subject to harmless error analysis." *Burdette*, 427 S.C. at 496, 832 S.E.2d at 578 (quoting *Belcher*, 385 S.C. at 611, 685 S.E.2d at 809); *see also State v. Brooks*, 428 S.C. 618, 627, 837 S.E.2d 236, 241 (Ct. App. 2019) ("Most trial errors, even those [that] violate a defendant's constitutional rights, are subject to harmless-error analysis." (alteration in original) (quoting *State v. Rivera*, 402 S.C. 225, 246, 741 S.E.2d 694, 705 (2013))). "When considering whether an error with respect to a jury instruction was harmless, we must 'determine beyond a reasonable doubt that the error complained of did not contribute to the verdict.'" *State v. Middleton*, 407 S.C. 312, 317, 755 S.E.2d 432, 435 (2014) (quoting *State v. Kerr*, 330 S.C. 132, 144-45, 498 S.E.2d 212, 218 (Ct. App. 1998)). Further, to determine whether an error in giving the instruction was harmless, we must consider the jury charge as a whole. *Burdette*, 427 S.C. at 498, 832 S.E.2d at 580. "We must review the facts the jury heard and weigh those facts against the erroneous jury charge to determine what effect, if any, it had on the verdict." *Kerr*, 330 S.C. at 145, 498 S.E.2d at 218. "[O]ur inquiry is not what the verdict would have been had the jury been given the correct charge, but whether the erroneous charge contributed to the verdict rendered." *Id.* "[W]hether or not the error was harmless is a fact-intensive inquiry." *Middleton*, 407 S.C. at 317, 755 S.E.2d at 435.

Considering the trial court's instruction as a whole and the facts the jury heard, we find the erroneous instruction did not contribute to be verdict rendered. *See Kerr*, 330 S.C. at 144-45, 498 S.E.2d at 218 ("[T]o find the error harmless, we must determine beyond a reasonable doubt that the error complained of did not contribute to the verdict."). Here, the record contains no evidence the erroneous instruction confused or misled the jury. Aside from the instruction challenged on appeal, the trial court charged the jury that malice was the "intentional doing of a wrongful act without just cause or excuse[] and with an intent to inflict an injury" and that malice could be inferred from conduct showing a total disregard for human life. The trial court did not charge any lesser-included offenses and the record contains no evidence that would tend to reduce, mitigate, excuse, or justify the homicide. Therefore, notwithstanding this was a circumstantial evidence case, no conflicting evidence concerning the shooter's intent was presented. Furthermore, the jury submitted three questions to the trial court during deliberations and none of these concerned malice. Although we are mindful that the instruction is now improper regardless of the evidence presented at trial, as Franks points out, his defense focused on discrediting the State's theory that he was the shooter and suggesting a third, unknown person may have committed the act. However, the trial court did not allow Franks to present evidence of third-party

guilt at trial, and Franks did not appeal that ruling. We acknowledge malice is an element of murder, meaning the State has the burden of proving that element beyond a reasonable doubt. Nevertheless, because the pivotal question before the jury in this case was whether Franks was the shooter and no evidence was presented tending to reduce, mitigate, excuse, or justify the homicide, the instruction was not misleading or confusing. Accordingly, we find, beyond a reasonable doubt, the erroneous instruction did not contribute to the verdict and does not require reversal.

Further, notwithstanding no evidence of an actual motive was presented and the evidence against Franks was circumstantial, there was overwhelming evidence of malice apart from the mere use of a deadly weapon. The victims were shot while they were inside of their home, the crime scene investigator testified the appearance of the room where they were found suggested a struggle had taken place, and there was no evidence either victim had been armed. Several witnesses testified concerning Franks's state of mind on the night of the shootings. Pulley, Tevin, and Kinard all testified he was "loud" and "hyped" or "amped." Kinard recalled Franks confronting James earlier that night about something James had posted on social media, although according to Kinard, the tension appeared to have resolved a short time later. According to Tevin and Kinard, Franks was the only person who stayed behind with James and Leake, and Tevin testified that when Franks found him later that night, Franks said "stuff went bad." Tevin stated Franks then asked him to drive him to Greenville, but while they were on the way, Franks asked him to go to Scurry's house in Fountain Inn instead. He recalled that during the car ride back the next morning, Franks said, "[w]e got to get the guns out the house." Tevin explained Franks told him to lie to police by telling them that after he dropped Kinard off, he picked up Franks and they drove to Greenville. Based on the foregoing, we find the evidence of malice was overwhelming such that the erroneous inference of malice instruction was harmless beyond a reasonable doubt.

**CONCLUSION**

Based on the foregoing, we conclude the trial court did not abuse its discretion by admitting Sergeant Kelley's expert testimony and the erroneous jury instruction was harmless beyond a reasonable doubt. Therefore, Franks's convictions are

**AFFIRMED.**

**KONDUROS and HILL, JJ., concur.**